**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 16-cv-3038**

THE ESTATE OF JEFFREY SCOTT LILLIS,
by and through its co-personal representatives Meghan Lillis and Michele Driscoll;
MEGHAN LILLIS, individually;
C.A.L., individually, a minor, by and through Michele Driscoll as guardian;
C.S.L., individually, a minor, by and through Michele Driscoll as guardian;
A.L., individually, a minor, by and through Robin Booth as next friend and mother;
JORDAN LILLIS, individually;
ASHLEY PERRY, individually;

       Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE COMPANIES, LLC;
GREAT PEAK HEALTHCARE SERVICES, P.C.;
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
MAXIM HEALTHCARE SERVICES, INC;
ARAPAHOE COUNTY;
DENNIS L. FURR, D.O. individually;
ANITA BROWN, RN, individually;
ROBLY EVANS, RN, individually;
DENISE ELWELL, RN, individually;
NANCY WINEGAR, RN, individually;
JASON FRANK, RN, individually;
RUTH KYAMBADDE, RN, individually;

       Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

      Plaintiffs, by and through their attorneys of HOLLAND, HOLLAND EDWARDS &

GROSSMAN, PC, and KILLMER, LANE & NEWMAN, LLP, complain against Defendants and request

a trial by jury as follows:

## I. <u>INTRODUCTION</u>

1.     Jeffrey Scott Lillis was a 37-year-old inmate at the Arapahoe County Detention Facility ("ACDF") who died on December 14, 2014, as a result of deliberate indifference to his known serious medical needs by Defendants.

2.     Mr. Lillis died of sepsis and severe bacterial pneumonia, easily treatable conditions that would not have killed him had Defendants provided him with proper and timely medical attention and treatment.

3.     Instead, Mr. Lillis' infection went entirely untreated and was allowed to ravage his body for days until it finally shut down.

4.     He died a harrowing and painful death on the floor of his cell surrounded by his own blood and vomit.

## II. <u>JURISDICTION AND VENUE</u>

5.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

6.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

7.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

8.     The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").

## III.  PARTIES

9.     At all times pertinent hereto, the decedent, Jeffrey Scott Lillis, was a resident of the State of Colorado and a citizen of the United States of America.

10.     At all times relevant hereto, Plaintiff Meghan Lillis was a resident of the State of Colorado and a citizen of the United States of America.  Plaintiff Meghan Lillis was the wife of Jeffrey Lillis.

11.     At all times relevant hereto, Plaintiff CAL was a resident of the State of Colorado and a Citizen of the United States of America.  Plaintiff CAL is the minor child of Jeffrey Lillis.

12.     At all times relevant hereto, Plaintiff CSL was a resident of the State of Colorado and a Citizen of the United States of America.  Plaintiff CSL is the minor child of Jeffrey Lillis.

13.     Plaintiffs CAL and CSL are minors and bring claims through their guardian, Michele Driscoll.

14.     Plaintiff AL is a minor and a resident of the State of New York and a Citizen of the United States of America. Plaintiff AL is a minor child of Jeffrey Lillis and brings claims through her mother Robin Booth.

15.     Plaintiff Jordan Lillis is a resident of the State of California and a Citizen of the United States of America. Plaintiff Jordan Lillis is a child of Jeffrey Lillis.

16.     Ashley Perry is a resident of the State of Connecticut and a Citizen of the United States of America. Plaintiff Ashley Perry is a child of Jeffrey Lillis.

17.     Defendant Correctional Healthcare Companies, LLC ("CHC") (formerly Correctional Healthcare Companies, Inc) is a private Delaware corporation with its principal street address located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217. Its registered agent of service in Colorado is located at 3773 Cherry Creek North Drive #575, Denver, CO 80209. This Defendant contracted with Arapahoe County to provide physician and other medical services for Arapahoe County at ACDF.

18.     Defendant Correct Care Solutions, LLC ("CCS") is a Tennessee corporation doing business in the State of Colorado, with its principal street address located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217.  Its registered agent of service in Colorado is located at 3773 Cherry Creek North Drive #575, Denver, CO 80209.  Correct Care Solutions, LLC acquired Correctional Healthcare Companies, Inc. in 2014.  This Defendant is believed to have merged or joined with Correctional Healthcare Companies, LLC prior to the allegations of this case and to be part of the contract with Arapahoe County.

19.     Defendant Correctional Healthcare Physicians, P.C. ("CHP") is a Colorado corporation with its principal street address and registered agent of service at 6200 S. Syracuse Way, Suite 440 Greenwood Village, CO 80111. This Defendant is believed to have contracted with or employed Dr. Furr and/or to provide physician services to inmates at ACDF.

20.     Defendant Great Peak Healthcare Services, P.C. ("Great Peak") (formerly both CHP and another entity called CCS Colorado Medical Services, P.C.) is a Colorado Corporation with its principal street address and registered agent of service at 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111. This Defendant is understood to be the successor entity to CHP and to have assumed the obligations of CHP, which employed or contracted with

Defendant Dr. Furr.

21.     Defendants CCS, CHC, CHP, and Great Peak are collectively referred to herein as the "CHC/CCS Defendants."

22.     CHC/CCS Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of CHC/CCS Individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs. CHC/CCS Defendants were acting under color of state law and performing a central function of the state.

23.     CHC/CCS Defendants are also sued for negligence as they are private corporations not entitled to any immunity under the Colorado Governmental Immunity Act.

24.     CHC/CCS Defendants are sued directly for negligence and negligent supervision for failing to ensure appropriate staffing and practices for the provision of appropriate care in the treatment of Mr. Lillis.

25.     Defendant Maxim Healthcare Services, Inc ("Maxim") is a Maryland corporation with is principal street address as 7227 Lee Deforest Drive, Columbia, MD, 21046.  Its registered agent of service in Colorado is the Corporation Service Company, 1560 Broadway, Suite 2090, Denver, CO 80202.  This Defendant contracted with Arapahoe County to provide nursing services to inmates at ACDF.  Further this Defendant employed Defendant Nurses Robly Evans and Denise Elwell.

26.     Maxim is a proper entity to be sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of Maxim employed individual Defendants, with respect to the provision of

medical care and treatment for inmates with serious emergency medical needs. Maxim was acting under color of state law and performing a central function of the state.

27.     Maxim is also sued for negligence as they are a private corporation, not entitled to any immunity under the Colorado Governmental Immunity Act.

28.     Maxim is sued directly and indirectly for negligence, negligent supervision, negligent training of their staff, for failing to ensure the provision of appropriate care in the treatment of Mr. Lillis, for the acts and omissions of their agents and/or employees, and for the herein described acts by their involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

29.     Arapahoe County is the public entity ultimately responsible for the operation of the Arapahoe County Detention Facility located at 7375 S. Potomac St., Centennial CO, 80112.

30.     Arapahoe County is sued under 42 U.S.C. § 1983 with respect to the hereinafter challenged deliberately indifferent policies and practices for the care and treatment of persons detained at the ACDF.

31.     Arapahoe County is liable under the non-delegable duty doctrine for the deliberately indifferent policies of CHC/CCS Defendants and Maxim.

32.     At all times relevant hereto, Defendant Dennis L. Furr, D.O. was a citizen of the United States and a resident of Colorado. Dr. Furr was employed by CHC/CCS Defendants and acting under color of state law.

33.     At all times relevant hereto, Defendant Anita Brown, RN, was a resident of Colorado and a citizen of the United States of America.  Defendant Brown was an employee of Arapahoe County and acting under color of state law.

34.     At all times relevant hereto, Defendant Robly Evans, RN, was a resident of Colorado and a citizen of the United States of America.  Defendant Evans was an employee of Maxim and acting under color of state law.

35.     At all times relevant hereto, Defendant Denise Elwell, RN, was a resident of Colorado and a citizen of the United States of America.  Defendant Elwell was an employee of Maxim and acting under color of state law.

36.     At all times relevant hereto, Defendant Nancy Winegar, RN, was a resident of Colorado and a citizen of the United States of America.  Defendant Winegar was an employee of Arapahoe County and acting under color of state law.

37.     At all times relevant hereto, Defendant Jason Frank, RN, was a resident of Colorado and a citizen of the United States of America.  Defendant Frank was an employee of Arapahoe County and acting under color of state law.

38.     At all times relevant hereto, Defendant Ruth Kyambadde, RN, was a resident of Colorado and a citizen of the United States of America. Defendant Kyambadde was an employee of Arapahoe County and acting under color of state law.

39.     These nurse defendants sued in their individual capacities are collectively referred to as the "Individual Nurse Defendants."

## IV.  STATEMENT OF FACTS

40.     Mr. Lillis was a pre-trial detainee at ACDF from August until he died on December 14, 2014 of sepsis caused by untreated bacterial pneumonia.

41.     Mr. Lillis had been sick and appeared very ill since around the beginning of December 2014.

42.     Mr. Lillis' fellow inmate, Sonny Torres, stated that Mr. Lillis had been complaining that was not feeling well throughout the first two weeks of December. He was nauseous and coughing a lot.

43.     On the night of December 11, 2014, his illness became so severe that Mr. Lillis submitted a kite (medical request) stating: "help, I am very sick, with a fever, headaches, cough, overall not feeling so good also my skin is so dry its driving me crazy."

44.     According to fellow inmate Thomas Karavolas, Mr. Lillis was up all night of the 11th seriously sick, suffering from a fever, and did not look good.

45.     Mr. Lillis also complained to Mr. Karavolas that he had not been feeling well for a few days.

46.     There was no response to the December 11th Kite.

47.     The next morning, on December 12, 2014, Mr. Lillis was too sick to wait for a response to his medical kite, and approached the nurse administering morning medication pass ("med pass").

48.     He told Paula Bertram, LPN, that he was sick.

49.     According to Nurse Bertram's chart notes, Mr. Lillis had a high temperature of 102.9 at 7:56 a.m. on December 12, 2014.

50.     Nurse Bertram transferred Mr. Lillis to the medical unit at ACDF for "observations." She found that he had a "sore throat," "fever (T>100)," and a "runny nose," and was "aching all over" and "coughing."

51.     Nurse Bertram initiated an "Influenza-Like-Illness" and Respiratory Infection protocols, and Mr. Lillis was given Tylenol, Mucinex, and an antihistamine.

52.     At around 9:35 a.m. on December 12, 2014, Mr. Lillis was visited by Cynthia Davis. Ms. Davis works with Addiction Research & Treatment Services (ARTS) and was evaluating whether Mr. Lillis should be placed in a residential addiction program rather than jail.

53.     It was obvious to Ms. Davis that Mr. Lillis was very sick.  During the visit, he had a towel over his head and was so physically uncomfortable that she offered to come back another day.

54.     He was obviously congested and very ill.  He was coughing into a towel.

55.     Ms. Davis heard Mr. Lillis asking a deputy walking through the hallway for medical help and the deputy said he would ask medical.

56.     Mr. Lillis told the deputy that he was really sick and needed help.

57.     No medical worker responded to this request while Ms. Davis was present.

58.     At around noon on December 12, 2014, Mr. Lillis was seen by Lucia Azocar, LPN.  At this time, he had a blood pressure reading of 113/76, pulse of 68, a respiratory rate of 19 breaths per minute ("respiration"), temperature of 97.5 and a blood oxygen level ("pulse ox") of 93% oxygen saturated hemoglobin relative to total hemoglobin in the blood.

59.     Nurse Azocar noted that Mr. Lillis had "discomfort with swallowing or talking," "nasal congestion," and "non-productive cough."  She charted that his throat and nares were "red" and his cough was "dry."

60.     At around 4:51 pm December 12, 2014, Mr. Lillis was seen by Defendant Anita Brown, RN.

61.     Nurse Brown charted that Mr. Lillis had "chills and fever, congestion and cough that is non-productive." She noted that he had sinus congestion and cough.

62.     At this time, Nurse Brown charted that he had a high fever of 102.5.  His blood pressure was 115/80, pulse was 100, respirations were 20, and his pulse ox was 91%.

63.     Mr. Lillis also complained to Nurse Brown of nausea and diarrhea.

64.     Nausea and diarrhea, accompanying a persistent high fever, congestion, chills, and cough, are signs that an illness has a systemic component likely caused by bacteria.

65.     They are also all symptoms of bacterial pneumonia, the infection that killed Mr. Lillis.

66.     These symptoms require doctor evaluation.

67.     Further, Mr. Lillis was known by all of the involved medical staff to be diagnosed with Hepatitis C, which put him at an increased risk from infections.

68.     Despite Nurse Brown knowing that Mr. Lillis had now been persistently and increasingly sick for days, had a dangerously high fever, a worsening cough, diarrhea, and nausea, she did not even call a doctor or obtain any treatment for this obviously sick man.

69.     Nurse Brown instead started a Headache Protocol and gave Mr. Lillis ibuprofen and Gatorade.

70.     On December 12th, around 10:19 pm, Defendant Jason Frank, RN saw Mr. Lillis during medication pass.

71.     Mr. Lillis had a very high temperature of 103.1.

72.     Nurse Frank did not take any blood pressure, pulse, respiration, or oxygenation readings.

73.     Nurse Frank also did not call the doctor or obtain any treatment for this obviously sick man.

74.    Nurse Frank simply continued to give Mr. Lillis ibuprofen and cold medicine, things that were clearly not working to resolve this growing infection.

75.    The next morning on December 13, 2014, at around 7:49 a.m., Mr. Lillis saw Defendant Robly Evans, RN. He had a temperature of 98.3. No blood pressure, pulse, respiration, or oxygenation readings were taken.

76.    On December 13, 2014, sometime in the mid afternoon, Mr. Lillis was seen again by Nurse Evans.

77.    At 2:33 p.m., Nurse Evans charted that he had a blood pressure of 99/76, respiration of 26, temperature of 98.8. He had a reported pulse ox of 98%.

78.    Nurse Evans also noted that he was coughing up blood, charting: Mr. Lillis "was C/O [complaining of] coughing and producing blood from coughing so hard."

79.    It is well known and obvious to lay people, as well as registered nurses, that coughing up blood is a serious condition, is outside a nurses' scope of practice to diagnose, and requires immediate medical evaluation.

80.    Coughing up blood is particularly serious in the context of this abnormally low blood pressure reading.

81.    Nurse Evans also noted a change in mental status, charting that Mr. Lillis was "agitated at staff."

82.    Agitation is a sign of hypoxia and sepsis.

83.    Nurse Evans finally called the on-call doctor, Defendant Dr. Furr.

84.    According to Dr. Furr, Nurse Evans reported that Mr. Lillis had "blood-tinged sputum."

85. To the extent that Defendant Evans didn't relay all of the critical information about Mr. Lillis' worsening condition and medical crisis to Dr. Furr, including that he was "producing blood" as she charted, this was an outrageous abandonment of Mr. Lillis by Nurse Evans in this medical crisis.

86. Moreover, even if Nurse Evans only told Dr. Furr that Jeff had blood-tinged sputum, blood in sputum in a sick person indicates a medical emergency because, among other things, they are symptoms of pneumonia.

87. Low blood pressure, high fever, high respiration and pulse, coughing up blood, and change in condition involving agitation were emergency symptoms and required transfer for higher level medical evaluation and a chest x-ray.

88. Dr. Furr did not order a chest x-ray, culture of the sputum, or any outside evaluation despite obvious signs of a worsening serious infection.

89. A chest x-ray would very likely revealed the significant pneumonia that caused Mr. Lillis's death.

90. Dr. Furr merely ordered cough medicine that ACDF apparently does not even maintain.

91. Thus, Nurse Robly charted that Dr. Furr ordered medication that they "did not have here; nor were able to get quickly."

92. Despite the fact that it is the policy of Arapahoe County and CHC/CCS Defendants not to have cough medication like that ordered by Dr. Furr available for inmates, the involved nurses did nothing to obtain a different prescription or inform the doctor of the continuing and escalating emergency symptoms.

93.     Regardless, the medication Dr. Furr ordered was Robitussin DMX and Robitussin with Codeine, which were mere cold medicines known to be completely ineffective to Mr. Lillis' bacterial infection.

94.     Nurses and Dr. Furr allowed this infection to spread throughout Mr. Lillis' body, because they chose not to provide a more expensive necessary medical evaluation.

95.     Nurse Robly told Mr. Lillis to elevate his head – another suggestion for Mr. Lillis that was of no use.

96.     Dr. Furr never came to evaluate Mr. Lillis or ask any other higher-level provider to evaluate this patient who was so sick he had to be taken out of general population and put into the medical unit with reports of coughing up blood.  There is also no sign in the medical record that he or any other medical provider ever checked in with nursing staff regarding Mr. Lillis.

97.     It was the policy, practice and custom of Arapahoe County and CCS Defendants at that time that no doctor or mid-level provider routinely evaluated inmates who were so sick they had to be brought to the medical unit from general population.

98.     Nursing staff did not call Dr. Furr or any other doctor ever again.

99.     Despite his serious symptoms, Mr. Lillis was not monitored or meaningfully evaluated. He was not put on a regular schedule to be checked and instead was primarily observed by nurses incidentally when they were on their routine med passes.

100.     On December 13, 2014, Defendant Denise Elwell, RN was conducting "1600 med pass."

101.     Nurse Elwell observed that Mr. Lillis' coughing had slowed down but "was still present."

102.    Nurse Elwell charted that at 4:00 p.m., Mr. Lillis had a temperature of 100.3.

103.    No blood pressure, pulse, respiration, or oxygenation readings were taken.

104.    Mr. Lillis obviously again asked for help for his serious medical condition because Nurse Elwell reported that, "Patient advised that no suppression medications are available."

105.    Nurse Elwell next charted at 10:30 p.m. on December 13, 2014, that "some congestion" was heard in his "L-Lower lung."

106.    No blood pressure, pulse, respiration, or oxygenation readings were taken.

107.    Nurse Elwell did not call a doctor or do anything to help Mr. Lillis obtain necessary treatment.

108.    Instead of treating this obvious serious condition of a patient who had been sick with a high fever, congestion, low blood pressure and cough producing blood, Mr. Lillis was merely given ibuprofen, salt water and cold medicines.

109.    On the morning of December 14, 2014 at around 7:30 a.m. during "AM med pass," Defendant Nancy Winegar, RN charted that Mr. Lillis complained of "weakness, sorthroat [sic], coughing, and fever x 4 days."

110.    Nurse Winegar noted that he had an elevated pulse of 121 and that his throat was red.

111.    At this point Mr. Lillis also had a temperature of 98.1, blood pressure of 104/71, respirations of 18 and a pulse ox of 91%.

112.    Pulse of 121 is significantly high and a sign of sepsis.

113.    In the context of these other symptoms, including the low blood pressure, Mr.

14

Lillis was probably going into sepsis and becoming hypovolemic.

114.    A common symptom of pneumonia is also a high heart rate.

115.    But once again, despite this persisting serious illness, which now included marked weakness, Nurse Winegar provided no meaningful medical attention and instead just told Mr. Lillis to rest and drink fluids.

116.    At around 4:45 p.m. on December 14, 2014, Mr. Lillis told Deputy J. Crist that he needed to speak with a nurse because he had "liver pain."

117.    Deputy Crist reported this new symptom to Defendant Ruth Kyambadde, RN.

118.    Nurse Kyambadde chose not to see Mr. Lillis at that time.

119.    After evening med pass, Mr. Lillis called the medical control tower and "again stated that he needed to speak with a nurse and that he wasn't feeling well."  He reported that he was in a lot of pain and needed medication.

120.    Nurse Kyambadde and Deputy Crist responded to his cell.

121.    Nurse Kyambadde spoke to Mr. Lillis who asked to be put on a withdrawal protocol despite having been incarcerated for months and thus not withdrawing from any drugs at that time, to all the involved medical workers' knowledge.

122.    Nurse Kyambadde asked Mr. Lillis what medications he was withdrawing, to which he responded: "None."

123.    A common symptom of both sepsis and pneumonia is confusion or disorientation, the exact type of mental state Mr. Lillis was now obviously exhibiting.

124.    Nurse Kyambadde recklessly chose to ignore his confused mental state, yet another serious medical emergent symptom ignored by staff.

125.    When the deputies served dinner, around 6:15 p.m., Deputy Christ reported to Nurse Kyambadde that Mr. Lillis "looked sick."

126.    He is seen on video extremely restless, getting up and down, holding his head in his hands, and unable to stay in one position for too long.

127.    About 40 minutes later, around 6:55 p.m., Nurse Kyambadde finally came to check on Mr. Lillis and found him "lying in bed on his left side."

128.    Nurse Kyambadde stated that he was "moving vigorously," holding his breath, and asking for anxiety medications.

129.    Nurse Kyambadde outrageously falsely reported that she was unable to take his vitals because "[h]e kept on moving and the machine would not register his vital signs because of movement."

130.    The video shows that Mr. Lillis was lying still the whole time for a matter of minutes while Nurse Kyambadde took blood pressure readings, temperature, and pulse ox.

131.    None of these readings less than an hour before he died were written down.

132.    Instead, Nurse Kyambadde later told falsely investigators that she tried three times to get his vitals but was unable due to Lillis' restlessness and him "holding his breath."

133.    More likely, Mr. Lillis' pulse ox and blood pressure readings were startlingly low because he was septic and dying.

134.    Nurse Kyambadde attributed this dire condition to faking and "holding his breath."

135.    Mr. Lillis told Nurse Kyambadde that he had "coughed up blood."

136.    At around 7:13 p.m., Nurse Kyambadde returned and callously gave Mr. Lillis "a

basin and asked him to cough up into that basin, so she could evaluate his condition better."

137.    Nurses are all trained and aware that coughing up blood is a serious medical condition, the evaluation and treatment plan for which is outside the scope of practice for nurses, requiring emergency treatment or at the very least, medical evaluation and diagnosis.

138.    Coughing up blood is an emergency symptom that requires transfer to a hospital or, at least, doctor evaluation.

139.    Nurses cannot diagnose or evaluate *why* an inmate is coughing up blood or order tests.

140.    Nurse Kyambadde, however, rather than call a doctor, actually required Mr. Lillis to prove that he was coughing up blood by coughing it into the basin.

141.    Mr. Lillis told Nurse Kyambadde that he also was having diarrhea.

142.    Mr. Lillis needed antibiotics and fluids to treat his infection and subsequent sepsis. Instead he was given ineffective over the counter medications, consisting of Tylenol, Ibuprofen, Mucinex, and antihistamine.  A person who was coughing up blood with a history of high fever, elevated pulse, headache, sore/red throat, severe coughing, diarrhea, low blood oxygen, and nausea requires an emergency higher level provider evaluation.

143.    Despite Mr. Lillis getting obviously worse and worse, coughing up blood, having a high fever, writhing around in a confused mental state, acting anxious and agitated, having a low blood pressure, elevated pulse, diarrhea, and multiple requests for actual medical treatment from Mr. Lillis, these nurses gave him ineffective ibuprofen and over the counter cold medicine, completely failing to get him seen by a doctor or transferred out of the facility to receive antibiotics or other necessary interventions.

144.    These involved nurses refused to even call back the doctor or make a plan for emergency care.

145.    Instead, Nurse Kyambadde offered Mr. Lillis some Gatorade.

146.    Gatorade is a deliberately indifferent response to an inmate coughing up blood and presenting with these life-threating symptoms.

147.    Mr. Lillis is obviously very ill and restless during this time. The video shows him leaning against the wall.

148.    At 7:26 p.m., the deputy comes back into the room and talks to Mr. Lillis and then leaves.

149.    At around 7:28 p.m., Mr. Lillis collapsed off of the toilet onto the floor.

150.    At 7:30 p.m., Deputy Dube, who was watching the cameras in the medical unit, reported to nurses the medical emergency that Mr. Lillis had fallen off the toilet.

151.    According to Deputy Dube:

I advised Nurse Ruth Kyambadde *2009045 that he had fallen from the toilet. Nurse Ruth wanted to see how he had fallen so the video was played backwards. He was seen falling to the floor using both of his hands to break his landing. He rolled to his left lying down on the floor. I saw him moving around the cell after he had fallen down.

152.    The video shows Mr. Lillis collapsing off the toilet and laying on the ground, crawling and rolling around in obvious suffering and distress.

153.    He can barely move.

154.    He is, however, clearly still alive in the video and moves across the floor toward his bed.

155.    Rather than respond to this obvious medical crisis, Nurse Kyambadde

inexplicably had the deputy rewind the video to watch him falling off the toilet and laying on the floor in agonizing pain.

156.    There was absolutely no medical justification for Nurse Kyambadde to review the video with the deputy to watch an inmate fall off the toilet and lie on the floor while he is dying.

157.    She wasted over ten crucial minutes in response to this obvious medical emergency reported by the deputy.  She stated: "after fall was reported I asked the deputy to rewind the tape to see how he happened to fall of the toilet and then I noted on camera that he was crawling to his bed but then lay down on his left side."

158.    It took over ten minutes before Nurse Kyambadde went to his cell to see why this very sick patient had fallen off the toilet and laid on the floor.

159.    Nurse Kyambadde asked Deputy Crist to accompany her to try again to get a blood pressure reading.

160.    When they entered the cell at approximately 7:41 p.m., Mr. Lillis was unresponsive but Nurse Kyambadde stated to Deputy Crist that he had a "faint pulse."

161.    Mr. Lillis was apparently still fighting to live during the over ten minutes this nurse chose to deny care and review video footage, for absolutely no possible medical reason.

162.    Nurse Kyambadde did not report the finding of this pulse in her post-incident report.

163.    When they entered his cell, Mr. Lillis had blood coming out of his mouth.  He was surrounded by his own blood and vomit on the floor.

164.    Nurse Kyambadde stated that, "when I entered the cell inmate was unresponsive laying supine assessed for pulse and could see blood coming out of his mouth."

165.   Finally, after days of severe and worsening obvious illness with a serious cough producing blood, diarrhea, and fever and ultimately his death, a medical emergency was called at 7:43 p.m.

166.   The only way Mr. Lillis' could get his emergent condition treated as an emergency was to die on the floor in his own blood and vomit.

167.   Continuing this pattern of reckless care, the emergency equipment, including the Automatic External Defibrillator (AED), was not readily available.

168.   Nurse Kyambadde asked for "an AED from booking and emergency air."

169.   Deputies brought the suction machine but it had been stored without the tubing and required components, causing nurses to run and look for the parts before nurses could even suction vomit out of Mr. Lillis' airway.

170.   Deputy Longfellow responded to a request to bring the AED but by the time an AED could be brought to Mr. Lillis his heart no longer showed electrical activity.

171.   Nurse Stephanie Haug, who responded to the medical emergency call, noted on the "Man Down Critique" form (which was part of Arapahoe County's review of Mr. Lillis' death) that emergency supplies were not "easily and quickly available, stating: "Booking suction tubing unavailable at site stored."

172.   Under the heading "what went wrong?" Nurse Haug reported "suction supplies not readily available – pt. [patient] passed away."

173.   Nurse Elwell also reported that not only was suctioning equipment not readily available but it also "took a while to get AED device up to MC11 [the medical cell where Mr. Lillis was]."

174.    Nurse Elwell attempted to minimize the importance of not having readily available emergency equipment, stating that it "may not have been necessary – appears patient may have been down for a period of time before being noticed."

175.    But in fact Mr. Lillis was not down after a period of not being noticed; rather, he was cruelly watched falling off the toilet and crawling to the bed for over ten minutes.

176.    Indeed, by the time the AED was finally brought to Mr. Lillis' cell, there was no shockable rhythm indicating use of AED.

177.    CPR and other Resuscitation efforts proved futile and Mr. Lillis was pronounced dead at 8:09 p.m. on December 14, 2014.

178.    After his death, Andrea Stephen, Supervising Criminalist, responded to the cell of Mr. Lillis and noted that he had vomit on his face and the floor around him.  His food tray was on the sink and "appeared to be untouched."

179.    Investigator Stephen took photographs of Mr. Lillis at the scene showing that he had been coughing up blood and vomiting.

180.    This is a picture of Mr. Lillis at around the time of his death:



181.    On autopsy, Dr. Kelly Lear-Kaul, Arapahoe County Coroner and Forensic Pathologist found that Mr. Lillis had "<u>very</u> severe pneumonia" (emphasis in original) and specifically concluded that his death as caused by "sepsis due to severe lobar pneumonia."

182.    Mr. Lillis was found to have staphylococcus aureus grown from his blood and lung tissue. He had a severe lobar pneumonia with abscess of his left lung, as well as bronchopneumonia of his right lung, a left pleural empyema and a recent history of fever and cough.

183.    His left lung was so infected and filled with purulent fluid that it weighed 1230 grams, almost twice the weight of his right lung and more than twice the weight of a normal post-mortem lung, which should be between 400 and 600 grams.

184.    The coroner also found "300 milliliters of purulent, cloudy yellow to red fluid accompanied by fibrinous adhesions involving the pulmonary pleural surfaces."

185.    Mr. Lillis' larynx and trachea showed "brown to red discoloration" and his left lung was "mottled with fibrinous adhesions."

186.    His lungs contained "blood and frothy fluid".  The parenchyma of the left lung was "red to purple and diffusely hemorrhagic appearing with extensive uniform diffuse consolidation compromising 75% of the parnchyma of the upper lobe and 100% of the parenchyma of the lower lobe."

187.    His left lung had a "2.5 centimeter irregular abscess."

188.    On microscopic examination of the lungs, the coroner found "necrotizing neutrophilic inflammation and mixed inflammatory cells, with mild to severe luminal narrowing of bronchi" and "marked diffuse neutrophilic involvement with parenchymal necrosis and micro

abscesses of the left lung."

189.    The coroner also found "hemorrhage with extensive bacterial overgrowth" in the lungs, in the "left greater than right."

190.    All these findings show that Mr. Lillis died a gruesome and painful death, accompanied by significant suffering.

191.    According to the Autopsy and Death Investigation, Mr. Lillis experienced a "'Cadaveric Spasm,' which is a rare form of muscular stiffening that occurs at the moment of death" and which is "usually associated with violent deaths happening under extremely physical circumstances with intense emotion."

192.    Mr. Lillis suffered immensely in the moments before he died, moments that were cruelly reviewed on video by nursing staff rather than helping him.

193.    The type of illness shown on Mr. Lillis' autopsy was so significant that his illness in the days prior to death would be obviously emergent to a layperson, and clearly to nurses.

194.    Even as early as the 12th of December in the morning, the seriousness of Mr. Lillis' illness was obvious to Cynthia Davis.

195.    As he became septic over the next days, those serious symptoms dramatically increased.

196.    The type of symptoms associated with this level of illness are very likely to have been even more significant than the already emergent but under-charted symptoms by involved nurses.

197.    It was only after the needless and painful death of Mr. Lillis that Arapahoe County and CHC/CCS implemented a requirement that jail doctors and mid-level providers

would actually routinely see and evaluate inmates who were brought to the medical unit from the general population.

198.    Pneumonia, sepsis and associated shock are treatable conditions through the administration of antibiotics and intravenous fluids.

199.    Had the nurses who saw Mr. Lillis over this period or Dr. Furr responded appropriately to Mr. Lillis' serious symptoms by obtaining the necessary treatment for Mr. Lillis, Mr. Lillis likely would not have died.

200.    Mr. Lillis was 37 years old at the time of his death.

201.    Jeffrey Lillis was much loved by his wife, Meghan Lillis, and all of his chidren, who along with his estate have suffered emotional harm and damages.

202.    Mr. Lillis and Meghan had been married since August 1, 2008, and had two children, CAL and CSL, together.

203.    Mr. Lillis had three other children: Ashley Perry, Jordan Lillis, and AL (who is still a minor).

204.    Although Ashley, Jordan, and AL did not live in Colorado, they each maintained a relationship with Mr. Lillis and have been devestated by his death.

205.    While Mr. Lillis' struggles with substance abuse affected his relationships with his wife and children, he loved his wife and children very much and they loved him.

206.    Because of Defendants' complained of conduct, the lives of Meghan, Ashley, Jordan, AL, CSL, and CAL will never be the same.

### Allegations Relating to *Monell* Liability

207.    Medical care in jails has become scandalously deliberately indifferent, causing

serious injuries and death to countless inmates around the Country.

208.    Many of these deaths are from entirely preventable or treatable diseases that rarely kill people outside of jail, such as bacterial pneumonia. These conditions or diseases are simply ignored and these inmates are left to die (often on the floor in their cell) without ever receiving any timely medical intervention.

209.    A major factor in this nationwide pattern is the use of private, for-profit, medical companies in providing care in jails, a practice motivated by a desire to cut costs.

210.    The use of private companies, and the respective contracts shifting various costs between counties and private companies, encourage cost reduction and discourage proper oversight. The for-profit motive contributes significantly to the development of widespread practices, policies and training that cause deliberate indifference to serious medical needs, including disincentivizing use of the appropriate level medical staff to evaluate illness and transfers for needed medical care, and treating inmates as though their known serious needs are faked or exaggerated.

211.    The County and these private Defendants are part of this nationwide problem.

212.    Arapahoe County contracts with CHC/CCS Defendants to provide upper level medical care, including doctor and nurse practitioner services, as well as to provide protocols and training related to such protocols to nurses, including on when to call on-call doctors.

213.    This contract requires CHC/CCS Defendants to provide adequate Physician, Nurse Practitioner or Physician Assistant care for the inmate population.  This contract requires a minimum number of provider hours but gives CHC/CCS Defendants discretion on the number of hours necessary to ensure constitutionally adequate medical care.

214.     On information and belief, no Physician or Nurse Practitioner or Physician Assistant was in the jail to see Mr. Lillis because he became gravely ill over the weekend and there is not regular staffing of medical providers on the weekend, only "telephone support."

215.     Similarly this contract provides for 24-hour on-call physician "telephone support" service that is utilized as a method for nurses to ask questions but does not require a doctor to actually evaluate a patient.

216.     While the contract between CHC/CCS Defendants and Arapahoe County provides for a minimum number of doctor and nurse practitioner hours on site, it did not require or provide for higher-level evaluation of inmates who were moved to the medical unit because they were too sick to be in the general population.

217.     Arapahoe County also contracts with Maxim to provide additional nurses to work in the jail.

218.     CHC/CCS Defendants, Maxim, and Arapahoe County ("entity Defendants") maintain unconstitutional policies and customs regarding providing emergency and/or higher-level care in a timely manner.

219.     It was well known by the entity Defendants prior to Mr. Lillis' death that there was a widespread pattern and practice of deliberately indifferent medical care in ACDF as well as other facilities run by CHC/CCS Defendants and/or Maxim, which included: not having inmates seen or evaluated by higher level medical providers, even when necessary to prevent serious injury or death; allowing and training nurses to practice outside their nursing scope; refusing to transfer inmates to a higher level of acuity even where necessary to prevent serious injury or death; and, a widespread custom and tolerated practice and habit of treating all inmate

or detainee illnesses as faked or not serious until an inmate/detainee can prove otherwise (although short of dying, it is not clear how they do this since obviously coughing up blood is not enough), often to save money on providers and testing.

220.    Arapahoe County appears also to use CHC/CCS Defendants' documents, protocols and/or policies in the provision of medical care to inmates by nursing staff. Additionally, the protocols employed by nurses should be signed by a doctor, believed to be the CHC/CCS Defendants' employee or agent.  This same person should be over signing nursing use of protocols and thus necessarily involved in the nursing care provided to patients.

221.    CHC/CCS Defendants and Arapahoe County failed to adequatley train the nursing staff on these protocols, including when to seek transport of an inmate for emergency services or call the doctor and how to effectively communicate with a doctor about a patient's condition.

222.    Maxim and Arapahoe County failed to adequately train and supervise their nursing staff, amounting to deliberate indifference to the serious medical needs of inmates presenting with serious conditions requiring medical evaluation and treatment.

223.    These Defendants are deliberately indifferently trained not to treat serious symptoms such as a persisting high fever, cough producing blood, and change in mental state as an emergency and, instead, to adopt a reckless wait and see approach without meaningful or appropriate evaluation.

224.    The need for such training and the probability that the failure to provide such training would cause an inmate like Mr. Lillis to die of a treatable illness like pneumonia was so obvious that Arapahoe County and Maxim's failure to do so constituted deliberate indifference to Mr. Lillis' serious medical needs.

225.    Arapahoe County and CHC/CCS Defendants adopted deliberately indifferent customs and practices regarding the staffing of ACDF with doctors and higher level providers including a staffing plan that did not require medical providers to routinely make rounds on inmates too sick to be in general population.

226.    The need to implement a policy that would require medical providers to routinely make rounds on such inmates and the probability that the failure to do so would cause an inmate like Mr. Lillis to die of a treatable illness like pneumonia was so obvious that Arapahoe County's and CHC/CCS' Defendants' failure to do so constituted deliberate indifference to Mr. Lillis' serious medical needs.

227.    CHC/CCS Defendants, Arapahoe County, and Maxim train and supervise ACDF nurses to adopt a reckless wait and see approach to serious medical conditions, and not to immediately have inmates with symptoms indicating serious conditions timely evaluated by higher-level providers.

228.    A wait and see approach for an inmate coughing up blood, with a high fever and other signs of systemic illness, is reckless and deliberately indifferent.

229.    A motivating factor in this reckless wait and see approach is the financial impact of hospitalization on these entity Defendants.

230.    This reckless wait and see approach is informed by the general widespread protocol of not spending the money to have patients actually evaluated in a timely fashion.

231.    Arapahoe County and involved companies participated in a Mortality Review after the death of Mr. Lillis and changed the policy of Arapahoe County and CHC/CCS Defendants to now require that a doctor routinely see inmates who are deemed too sick to stay in

the general population. The Mortality Review specifically states that Arapahoe County and CHC/CCS Defendants were: "initiating immediately, rounds on all patients in the Inpatient Unit who have been brought in from a general population housing unit. The doctor and/or nurse practitioner will round with the inpatient nurse each day they are there to ensure that no medical condition/concern is missed."

232.   Sadly, this obviously necessary policy for doctors to actually see and evaluate sick people was not in place at the time of Mr. Lillis' death.

233.   Instead, Mr. Lillis was kept in the medical unit while his body was ravaged by an untreated infection under the reckless wait and see approach.

234.   Despite review of the foregoing deliberate indifference of the nurses involved in Mr. Lillis's death, no nurses were disciplined as a result of this needless death.

235.   Even without the benefit of formal discovery, undersigned counsel is already aware of at least one other inmate at ACDF, who was denied timely medical care and emergency treatment for an infection, resulting in amputations of all of his toes due to an untreated infection requiring antibiotics, as here.

236.   Thus, in 2013, James Neisler was treated with reckless deliberate indifference by nurses and medical personnel at ACDF evidenced by their multiple conscious refusals to act and utter abandonment of this man in medical crisis for a month, including their deliberately indifferent refusal to let him see a doctor in a timely fashion, not giving him necessary antibiotics for a raging infection, and their decision to not secure necessary medical attention or timely transfer him out of the facility, as was needed and required.

237.    CHC/CCS Defendants are a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates.

238.    There is an abundance of examples in Colorado, and nationwide, establishing that these companies and the counties that employ them are deliberately indifferent in their policies, customs, and practices with respect to the medical needs, and constitutional rights of inmates. CHC/CCS entities frequently enter into contractual arrangements that, at least in part for cost saving reasons, do not provide adequate physician or access to other higher level medical provider time to meet Constitutional requirements for care.

239.    On December 14, 2014, the same day that Mr. Lillis died, a jury awarded an approximately $11 million dollar verdict against CHC related Defendants, for failing to provide timely medical care to an inmate in Jefferson County who was having a stroke. The jury found that this company had a deliberately indifferent pattern of practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, and awarded millions of dollars in punitive damages for these deliberately indifferent customs and policies. See *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 1:13-cv-01080-RBJ-BNB (D. Colo.).  In that case it was alleged that CHC tolerated and encouraged such a pattern and practice to save money because of its contractual set-up with Jefferson County.

240.    On June 3, 2013, Tanya Martinez, a pre-trial detainee housed at the Pueblo County Detention Facility also died alone, in a lockdown jail cell, from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Martinez's preventable death occurred after she displayed obvious signs of withdrawal, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and medical staff failed to

regularly monitor Ms. Martinez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her.

241.    In April of 2014, CCS/CHC related Defendants unconstitutionally caused the death of John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his obvious and serious medical condition. Involved staff disregarded his obvious malnourishment and dehydration, withdrawal related conditions, and refused to transport him to the hospital for emergency medical evaluation.  Mr. Walter also ultimately died on the floor of his cell. This case similarly alleges that these entity Defendants entered into a contract with the County that incentivized and caused deliberately indifferent care.

242.    On March 1, 2015, 38-year-old Jennifer Lobato, a detainee housed in Jefferson County Detention Center died from a withdrawal related electrolyte imbalance on the cold concrete floor of her cell. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone.  Ms. Lobato's condition continued to rapidly deteriorate until she was vomiting profusely. Rather than providing her with the timely medical attention and treatment she so desperately needed, Ms. Lobato was forced to clean up her own vomit and was, like Mr. Lillis, left to suffer an agonizing death in her cell from an entirely treatable condition.  It was alleged that CHC/CCS Defendants have a financial incentive because of their contractual relationship with Jefferson County to continue to foster an environment of skepticism toward inmate complaints and a reckless wait and see approach to inmate care.

243.    In *Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al.*, Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.), several plaintiffs sued Defendant CHC/CCS in connection with

three deaths and one near fatality that occurred at the Tulsa County Jail. One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms.  Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied. It was alleged that "[t]here is a longstanding policy, practice or custom at the Jail of CCS/CHM/CHMO and TCSO [the jail] of refusing to send inmates with emergent needs to the hospital . . . ."

244.    In *Lara-Williams/Burke v. Glanz, et al,* 11-CV-720, an inmate named Earl Williams died in 2011 in Tulsa County Jail after he was known to have gone days without food or water.  Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate 'faking or malingering' diagnosis that prevented him from receiving timely hospital care. Expressly concluding that he was faking paralysis, the nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. CHC staff moved him into a medical 'observation room' to videotape him *to prove* that his paralysis was fake – which it turned out not to have been. Before he died, staff threw food at Mr. Williams and put water just outside his reach. It was alleged in that case that the CHC-related defendants "maintained a policy, practice, and/or custom of severely limited the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in disregard to the known, obvious and excessive risks to the health and safety of inmates."

245.    In *Layton v. Board of County Commissioners of Oklahoma County, et al.,* Case No. 5:09-cv-01208-C (W.D. Okla.), Charles Holdstock died after the medical staff of a CCS-

related company ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication). Mr. Holdstock was found unresponsive on his cell floor and later died.

246. In *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado et al.*, Case No. 1:10-cv-02740-CMA-MEH (D. Colo.), Bruce Howard died of a cardiac arrhythmia after CCS staff denied him his heart medication after his arrest. During his brief incarceration, Mr. Howard made repeated pleas to CCS medical staff for his heart medication that were ignored. He received no treatment despite his visible shakiness and assertions that he was hallucinating.

247. In *Moritz v. Correctional Healthcare Companies, Inc., et al.*, Case No. 4:14-cv-00656-GFK-PJC (N.D. Okla.), Michael Moritz died in the Tulsa County Jail. CCS employees denied his repeated requests to administer his medications. Mr. Moritz's situation became critical, and he was finally transported by ambulance to the emergency room where he remained on life support until his death.

248. In *Guerrero v. Wichita County, Texas et al.*, Case No. 7:14-cv-0058-O (N.D. Tex.), CCS employees ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell. CCS staff then failed to transport her to the hospital for safe delivery. The baby was purplish and in need of medical attention upon delivery, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

249. A common thread in these cases is that CCS and related companies encourage and tolerate practices and culture of ignoring obvious signs and symptoms and denying inmates access to necessary, emergent medical care in part out of financial motivations caused by their contractual relationships with governmental entities.

250.    Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by CHC-related entities.

251.    In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

252.    In 2008, the Department of Justice found that the Tulsa jail medical program, administered by a CHC related entity, was constitutionally deficient in a number of regards. Specifically DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail, after all her complaints, including that her water had broken, were ignored.  The DOJ found that there were "critical lapses in getting emergency medical care to detainees." DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

253.    In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC related companies despite the abundant notice of the same from NCCHC and DOJ.

254.    In 2010, during a NCCCS audit, high-level employees of CHC attempted to fraudulently change medical records to give the appearance of compliance. NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services.  Even after this audit, CHC did not take the corrective measures necessary to alleviate

the obvious and substantial risks to inmate health. High-level CHC employees repeatedly brought to CHC's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

255.    In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CHC's care.

256.    In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies and reported that: *"CRCL found a prevailing attitude among clinic staff of indifference...."*; *"Nurses are undertrained.* Not documenting or evaluating patients properly."

257.    Defendant Maxim has exhibited a similar pattern and practice of deliberate indifference to known and serious medical needs, frequently delaying or not conducting even routine medical assessments of critically ill inmates, and refusing to send out inmates for necessary life-saving hospital care. As a predictable result of Maxim's deliberate indifference, inmates in Maxim's care die of eminently treatable conditions, or are permanently maimed by unconscionably delayed medical treatment.

258.    In 2008, Maxim nurses working at Multnomah County Detention Center in Oregon allowed detainee Holly Jean Casey to die of untreated pneumonia, like Mr. Lillis here. From the afternoon of her detention, through the night, and into the next morning, Ms. Casey begged Maxim medical personnel for treatment. She told Maxim nurses she was on her way to

the hospital due to a recurring bout of pneumonia when she was arrested. She repeatedly complained that her chest was tight and that she couldn't breathe. The Maxim nurse who evaluated Ms. Casey took exactly one set of vital signs, which did not include a basic oxygen saturation test even though the necessary equipment was readily available. Despite Ms. Casey's obvious signs of severe and worsening pneumonia, including headaches, dehydration, sputum-productive coughing, and severe difficulty breathing, the Maxim nurse improperly diagnosed Ms. Casey with asthma and offered her a few puffs on an inhaler and refused to provide obviously needed medical attention and higher level evaluation.  Maxim nurses never evaluated Ms. Casey again.  She was never sent out to a hospital for emergency care. After more than fifteen hours of begging for medical help and being largely ignored, Ms. Casey died, according to a later autopsy, of untreated pneumonia. *Wheeler v. Multnomah County et al.*, Case No. 3:09-CV-1518-AC (D. Or.).

259.   Mary McCoy was also allowed to die of a treatable medical condition by Maxim medical personnel. Upon her April 2015 incarceration in Franklin County Correctional Center, Ms. McCoy was suffering from gastrointestinal bleeding and alcohol withdrawal. She was obviously confused and disoriented. Ms. McCoy was so frail and weak she could hardly walk and could not sit upright. A Maxim nurse found Ms. McCoy lying on the floor, unresponsive to commands to get up. Rather than treat an obviously sick woman in her care, the Maxim nurse shoved smelling salts under Ms. McCoy's nose to revive her. Nearby Deputies then had to help Ms. McCoy to her feet, whereupon she immediately collapsed once the Deputies removed their support. Ms. McCoy was then transferred to another wing of the jail, where Maxim medical personnel took exactly one set of vital signs. During this cursory exam Ms. McCoy's blood

pressure was so low it did not register. Maxim nurses never took Ms. McCoy's vital signs again. Maxim nurses never arranged a doctor visit or other higher level evaluation. Maxim personnel never sent Ms. McCoy out to a hospital. Instead, Maxim medical personnel allowed Ms. McCoy to die on the floor of her cell, a victim of treatable gastrointestinal bleeding and shock. *Pullins v. Franklin County*, Ohio, et al., Case No. 2:15-CV-2919 (S.D. Ohio).

260.    In April 2016, when Matthew Garrison was incarcerated by the Arizona Department of Corrections (ADOC), he immediately informed medical personnel—Maxim nurses and doctors working for private healthcare providers Wexford and Corizon, respectively—that he had recently been successfully treated for rectal cancer. Maxim medical personnel, however, didn't bother to conduct an initial physical exam or otherwise evaluate this known cancer survivor in their care. Unfortunately, only weeks after his incarceration Mr. Garrison's rectal cancer and related symptoms returned. Mr. Garrison immediately notified Maxim medical personnel, who then engaged in an unconscionable series of delaying tactics. Mr. Garrison's initial examination was delayed several weeks. A subsequent urgent request for an outside oncologist consult was delayed six months. The oncologist's recommendation for further biopsies and possible surgery was delayed almost a year. During this delay Mr. Garrison's rectal cancer continued to worsen—he developed a massive rectal tumor. Finally, more than twenty-five months after his first oncology consult was ordered, Mr. Garrison was sent out to have his life-saving surgery. Because Maxim medical personnel delayed Mr. Garrison's cancer treatment for so long, the outside surgeons were forced to remove Mr. Garrison's anus, appendix, and ten feet of his colon in order to get rid of his life-threatening tumor. *Garrison v. Arizona, et al.*, Case No. 4:16-cv-00074 (D. Ariz.).

261. Dennis Choquette entered the Colorado Territorial Correctional Facility (CTCF) in March 2015 with a well-known history of Charcot foot syndrome. In fact, Mr. Choquette had been transferred to CTCF from another facility specifically because of prior exacerbation of his Charcot-related symptoms. Charcot is a complication of diabetes characterized by fractures, dislocations, and obvious deformity of the patient's feet and ankles. If left untreated, Charcot causes swelling, ulceration, infection, and limb-amputation. At CTCF a Maxim nurse practitioner examined Mr. Choquette's particularly acute Charcot-affected left foot. She noted its severe deformity and loss of sensation. Over the course of the next several months, Mr. Choquette repeatedly asked this Maxim nurse for his previously ordered follow-up send-out to an orthopedic specialist. However, the Maxim nurse casually adopted a "wait and see" attitude, deciding that Mr. Choquette "might" be a candidate for an orthopedic follow-up, even as he exhibited predictable swelling and signs of infection. Mr. Choquette never got his follow-up orthopedic visit. In fact, in late 2016 he was rushed to an outside hospital with a body wide infection. Mr. Choquette required emergency surgery to amputate his left leg, which had been destroyed by Charcot. As a result of this surgery and ongoing deliberate indifference to his serious medical needs, Mr. Choquette died. *Choquette v. CCA et al.*, Case No. 16-cv-1845 (D. Colo.).

## V.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment**
**Deliberately Indifferent Medical Care**
(Plaintiff Estate against all Individual Nurse Defendants and Dr. Furr)

262.    Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

263.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

264.    Jeffrey Scott Lillis was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

265.    Mr. Lillis was a pre-trial detainee.

266.    As a pre-trial detainee, Mr. Lillis was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

267.    Under the Fourteenth Amendment, Mr. Lillis is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

268.    To the extent he was under any conviction, Mr. Lillis was also protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

269.    Each individual Defendant knew or should have known of these clearly established rights at the time of Mr. Lillis' death.

270.    Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

271.    Individual Nurse Defendants knew of and disregarded the excessive risks associated with Mr. Lillis' serious and life-threatening medical condition and nonetheless, with deliberate indifference, decided not to report the severity of the symptoms or their ongoing nature, or obtain a medical evaluation or necessary urgent medical care. They did so despite being expressly aware of Plaintiff's known serious medical needs, obvious need for the same and recklessly disregarding a substantial risk of physical harm and death to Plaintiff.

272.    Dr. Furr knew of and disregarded the excessive risks associated with Mr. Lillis' serious and life-treatening medical condition and nonetheless, with deliberate indifference, decided not to evaluate Mr. Lillis, obtain for him obviously needed higher level medical evaluation, including but not limited to a chest x-ray, or otherwise provide him with obviously needed orders and tests.  He did so despite being expressly aware of Plaintiff's known serious medical needs, obvious need for the same and recklessly disregarding a substantial risk of physical harm and death to Plaintiff.

273.    When Mr. Lillis, and others acting on his behalf, alerted each individual Defendant to his need for medical assistance, Defendants acted with deliberate indifference to his readily apparent need for medical attention and his constitutional rights by refusing to obtain and provide the appropriate medical treatment.

274.    These Defendants acted with deliberate indifference to Mr. Lillis' deteriorating condition, including but not limited to, a severe cough producing blood; a persistent high temperature, elevated pulse, low blood oxygen level; nausea and diarrhea; a change in mental status; systemic illness; and obvious need for medical attention.

275.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

276.    The Individual Nurse Defendants' and Dr. Furr's failure to provide proper medical care to treat Mr. Lillis' known serious medical needs was not rationally related to a legitimate non-punitive governmental purpose.

277.    The acts or omissions of each individual Defendant were the legal and proximate cause of Mr. Lillis' death.

278.    As a direct result of Defendants' unlawful conduct, Mr. Lillis suffered extreme physical and mental pain and suffering for days, including the violent pain and trauma he experienced at the moments of his death.

279.    These intentional actions and inactions of each individual Defendant as described herein intentionally deprived Mr. Lillis of due process and of rights, privileges and liberties secured by the Constitution of the United States of America causing him and his estate damages.

280.    As a proximate result of the individual Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Lillis, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described horrific and terrifying pain and suffering during and leading up this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. Lillis, who worked as an arborist, under the mortality tables and other special damages, all in amounts to be proven at trial.

281.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

282.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against individual Defendants, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Deliberately Indifferent Policies**
(Plaintiff Estate against Arapahoe County, Maxim, and CHC/CCS Defendants)

283.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

284.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

285.    Mr. Lillis was a citizen of the United States and the entity Defendants to this claim are persons for the purposes of 42 U.S.C. §1983.

286.    Mr. Lillis was a pre-trial detainee.

287.    As a pre-trial detainee, Mr. Lillis was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

288.    Under the Fourteenth Amendment, Mr. Lillis is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

289.   To the extent he was under any conviction, Mr. Lillis was also protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

290.   CHC/CCS Defendants, at all times relevant hereto, were acting under color of state law, as the functional equivalent of a municipality providing medical care to inmates.

291.   CHC/CCS Defendants are liable for their deliberately indifferent policies, practices, habits, customs and widespread usages as described with particularity above with respect to the serious medical needs of inmates like Mr. Lillis and their deliberately indifferent failures in training and supervising their employees, including individual Defendant Dr. Furr. These Defendants have a widespread pattern of deliberately indifferent medical care in ACDF and other jails where they provide medical care, which includes: refusing to let inmates be seen by higher level medical providers, even when obviously necessary to prevent serious injury or death; choosing to not have their medical providers routinely see inmates that have been removed from general population due to sickness, in part to save money; refusing to allow inmates access to needed medical evaluations; allowing nurses and doctors to rely on nurses to diagnose outside their nursing scope; and, a widespread custom and tolerated practice and habit of treating all inmate or detainee illnesses as faked or not serious until an inmate/detainee can prove otherwise, often to save money on providers and testing.[1]

---

[1] Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

292.     Maxim, at all times relevant hereto, was acting under color of state law, as the functional equivalent of a municipality providing medical care to inmates.

293.     Maxim is liable for its deliberately indifferent policies, practices, habits, customs and widespread usages as described with particularity above with respect to the serious medical needs of inmates like Mr. Lillis and its deliberately indifferent failures in training and supervising its employees, including individual Defendants Evans and Elwell. Maxim has a widespread pattern of deliberately indifferent medical care in ACDF and other jails where it provides medical care, which includes: refusing to let inmates be seen by higher level medical providers, even when obviously necessary to prevent serious injury or death; refusing to allow inmates access to needed medical evaluations; allowing nurses to diagnose outside their nursing scope; and, a widespread custom and tolerated practice and habit of treating all inmate or detainee illnesses as faked or not serious until an inmate/detainee can prove otherwise, often to save money on providers and testing.

294.     Arapahoe County, at all times relevant hereto, was acting under the color of state law.

295.     Arapahoe County is directly liable for its own deliberately indifferent policies and supervision that were moving forces in Mr. Lillis' constitutional injury, for its deliberately indifferent training and supervision of nurses, for its own role in setting policy regarding medical care at the jail, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference. Arapahoe County has a widespread pattern of deliberately indifferent medical care in ACDF, which includes: refusing to let inmates be seen by higher level medical providers, even when obviously necessary to prevent serious injury or death; choosing to

not have medical providers see inmates that have been removed from general population due to sickness, in part to save money; refusing to allow inmates access to needed medical evaluations; allowing nurses to diagnose serious medical conditions outside their nursing scope; and, a widespread custom and tolerated practice and habit of treating all inmate or detainee illnesses as faked or not serious until an inmate/detainee can prove otherwise, often to save money on providers and testing.

296.   Arapahoe County is also non-delgably liable for the deliberately indifferent policies, training, and supervision of the private companies it contracts with to provide medical care at ACDF, including CHC/CCS Defendants and Maxim.

297.   The entity Defendants' deliberately indifferent policies, failures to train and/or supervise, were moving forces in the violation of Mr. Lillis' constitutional rights.

298.   The entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

299.   The failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Lillis.

300.   The entity Defendants, through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious medical conditions, in part to save money.

301.    The entity Defendants' policies, practices, habits, customs, widespread usages, and lack of training and supervision that resulted in the failure to provide proper medical care to treat Mr. Lillis' known serious medical needs were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

302.    As a proximate result of Defendant's unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Lillis, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described horrific and terrifying pain and suffering during and leading up this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. Lillis under the mortality tables and other special damages, all in amounts to be proven at trial.

303.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

304.    Plaintiffs are entitled to punitive damages against CHC/CCS Defendants and Maxim, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### THIRD CLAIM FOR RELIEF
#### Wrongful Death
(Plaintiffs Meghan Lillis, CAL, CSL, AL, Jordan Lillis and Ashley Perry against CHC/CCS Defendants, Maxim, Dr. Furr, Nurse Evans and Nurse Elwell)

305.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

306.    CHC/CCS Defendants and Maxim are private corporations that contract with Arapahoe County to provide medical care and health services to inmates at the ACDF.

307.     Defendants Furr, Evans and Elwell are private individuals, and not public officials or employees.

308.     These Defendants are therefore not entitled to any immunity under the CGIA.

309.     At all times relevant to this action, Mr. Lillis was under the medical responsibility, care, and treatment of Defendants hereto.

310.     Defendants Furr, Evans, Elwell and other care providers had a duty to provide reasonable medical care and treatment to detainees at the ACDF, including Mr. Lillis.

311.     CHC/CCS Defendants and Maxim had the duty to exercise reasonable care in the training and supervision of their employees.

312.     These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

313.     Through their actions and omissions, Defendants Furr, Evans, Elwell and other care providers breached their duty of care when they knowingly failed to properly assess, monitor, treat and care for Mr. Lillis, despite that fact that he was in obvious need of immediate medical attention.

314.     Defendants Furr, Evans, and Elwell had doctor-patient or nurse-patient relationships with Mr. Lillis at all relevant times and were acting within the scope of their employment throughout the duration of these relationships.

315.     With respect to their care and treatment of Mr. Lillis, Defendants Furr, Evans and Elwell owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight

exercised by and expected of medical personnel in similar situations.  Defendants Furr, Evans and Elwell breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Mr. Lillis.

316.   As a direct and proximate result of Defendants Furr, Evans and Elwell having breached their duty to provide reasonable medical care and treatment to Mr. Lillis, he suffered significant physical and mental pain and suffering, and other damages, and ultimately died.

317.   Maxim and CHC/CCS Defendants are vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

318.   CHC/CCS Defendants are also directly liable as they breached their duty to exercise reasonable care in the training and supervision of their employees and agents in a manner that provided the detainees under their care with reasonable medical care and treatment.

319.   CHC/CCS Defendants knew or should have known that the lack of supervision, experience, and training among their employees and agents was likely to harm ACDF detainees in need of medical care, including Mr. Lillis.

320.   In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, CHC/CCS Defendants were negligent and proximately caused Mr. Lillis death.

321.   The negligent acts and omissions by these Defendants were a substantial and significant contributing proximate cause of the death of Mr. Lillis.

322.    As a result of the complained of negligence, Plaintiffs hereto have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

323.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward the husband/father of Plaintiffs, including, but not limited to, funeral expenses and financial losses due to the financial benefits they would have reasonably been expected to receive from their husband/father had he lived, and non-economic damages for grief, loss of their husband/father's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional distress. Plaintiffs hereto are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

324.    Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Mr. Lillis and the Plaintiffs.

325.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants and enter the following relief:

(a)    All appropriate relief at law and equity;

(b)    Economic losses on all claims allowed by law;

(c)    Compensatory and consequential damages, including damages for emotional distress, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)    Pre- and post-judgment interest at the highest lawful rate; and

(g)    Any further relief that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST TRIAL BY JURY.**

Respectfully submitted this 12th day of December, 2016.

| | |
|---|---|
| */s/ Erica T. Grossman*<br>Erica T. Grossman<br>Anna Holland Edwards<br>John R. Holland<br>Dan Weiss<br>Holland, Holland Edwards & Grossman, PC<br>1437 High Street<br>Denver, CO 80218<br>Anna@hheglaw.com<br>john@hheglaw.com<br>erica@hheglaw.com<br>dan@hheglaw.com<br>Phone:  (303) 860-1331<br>Fax:  (303) 832-6506<br>Counsel for C.S.L., C.A.L, A.L., Jordan Lillis and Ashley Perry | */s/ David Lane*<br>David Lane<br>Liana Orshan<br>Killmer, Lane & Newman, LLP<br>1543 Champa Street, Suite 400<br>Denver, CO 80202<br>Dlane@kln-law.com<br>lorshan@kln-law.com<br>Phone:  (303) 571-1000<br>Fax:  (303) 571-1001<br>Counsel for Meghan Lillis |

## **CERTIFICATE OF REVIEW**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

/s/ *Erica T. Grossman*
Erica T. Grossman