IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-03038-KLM

THE ESTATE OF JEFFREY SCOTT LILLIS, by and through its co-personal representatives
Meghan Lillis and Michele Driscoll,
MEGHAN LILLIS, individually,
C.A.L., individually, a minor, by and through Michele Driscoll as guardian,
C.S.L., individually, a minor, by and through Michele Driscoll as guardian,
A.L., individually, a minor, by and through Robin Booth as next friend and mother,
JORDAN LILLIS, individually, and
ASHLEY PERRY, individually,

      Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC,
CORRECTIONAL HEALTHCARE COMPANIES, LLC,
GREAT PEAK HEALTHCARE SERVICES, P.C.,
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.,
MAXIM HEALTHCARE SERVICES, INC,
ARAPAHOE COUNTY,
DENNIS L. FURR, D.O. individually,
ANITA BROWN, RN, individually,
ROBLY EVANS, RN, individually,
DENISE ELWELL, RN, individually,
NANCY WINEGAR, RN, individually,
JASON FRANK, RN, individually, and
RUTH KYAMBADDE, RN, individually,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court on the following motions: (1) **Motion to Dismiss**

Plaintiffs' Second and Third Claim [#16][1], filed by Defendants Correct Care Solutions, LLC ("CCS"), Correctional Healthcare Companies, LLC ("CHC"), Great Peak Healthcare Services, P.C. ("Great Peak"), and Correctional Healthcare Physicians, P.C. ("CHP") ("CHC/CCS's Motion"); (2) **Motion to Dismiss Plaintiffs' First Claim** [#21], filed by Defendant Dennis Furr ("Furr's Motion"); (3) **Motion to Dismiss Complaint** [#23], filed by Defendants Anita Brown, Nancy Winegar, Jason Frank, and Ruth Kyambadde ("ACSO's Motion"); (4) **Motion to Dismiss Complaint** [#26], filed by Defendant Arapahoe County ( "Arapahoe's Motion"); (5) **Motion to Dismiss Plaintiffs' Second Claim** [#35], filed by Defendant Maxim Healthcare Services, Inc. ("Maxim's Motion"); (6) **Motion to Dismiss Plaintiffs' First Claim** [#36], filed by Defendant Robly Evans ("Evans' Motion"); and (7) **Motion to Dismiss Plaintiffs' First Claim** [#37], filed by Defendant Denise Elwell ("Elwell's Motion"). Plaintiffs filed Responses [#43, #44, #45, #46, #56, #57, #58] in opposition to the Motions, and Defendants filed Replies [#59, #60, #62, #63, #65, #66, #67]. The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises. Based on the following, Defendant Evans' Motion [#36] is **DENIED**, Defendants Elwell, Furr, Arapahoe County, and Maxim's Motions [#21, #26, #35, #37] are **GRANTED**, and the ACSO Defendants and CHC/CCS Defendants' Motions [#16, #23] are **GRANTED in part** and **DENIED in part**.[2]

## I. Background

---

[1] "[#16]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#31].

Plaintiffs allege the following facts as the basis for their claims.[3]  On December 14, 2014, Jeffrey Scott Lillis ("Lillis") died as the result of sepsis caused by bacterial pneumonia while detained in the Arapahoe County Detention Facility ("ACDF") in Arapahoe County, Colorado.  *Compl.* [#1] ¶¶ 1, 40.  Plaintiffs are Mr. Lillis' wife, his minor children through their guardian or mother, and his adult children.  *Id.* ¶¶ 10-16.

Mr. Lillis was "known by all of the involved medical staff to be diagnosed with Hepatitis C, which put him at an increased risk from infections."  *Id.* ¶ 67.  He became sick around the beginning of December 2014, and on the night of December 11, 2014, he submitted a kite asking for medical attention, but he did not receive a response.  *Id.* ¶¶ 41, 43, 46.  The next morning, December 12, 2014, Mr. Lillis approached Nurse Paula Bertram, LPN, who was administering morning medication pass ("med pass") and informed her that he was sick.  *Id.* ¶¶ 47-48.  She charted that he had a temperature of 102.9 degrees at 7:56 a.m.  *Id.* ¶ 49.  She then had him transferred to the medical unit at ACDF where "Influenza-Like-Illness" and "Respiratory Infection" protocols were initiated, including providing Mr. Lillis with Tylenol, Mucinex, and an antihistamine.  *Id.* ¶¶ 50-51.  Around noon that same day, Mr. Lillis was seen by Nurse Lucia Azocar, LPN, and then, at approximately 4:51 p.m., he was seen by Defendant Anita Brown, RN ("Brown") who charted that he "had 'chills and fever, congestion and cough that is non-productive.'"  *Id.* ¶¶ 58-61.  Defendant Brown "did not call a doctor or obtain any treatment for" Mr. Lillis and instead started him on a "Headache Protocol," giving him ibuprofen and Gatorade.  *Id.* ¶¶ 68-69.  That same day at

---

[3]  All well-pled facts from the complaint are accepted as true and viewed in the light most favorable to Plaintiffs.  *See Barnes v. Harris*, 783 F.3d 1185, 1191-92 (10th Cir. 2015).

approximately 10:19 p.m., Defendant Jason Frank, RN ("Frank") saw Mr. Lillis during med pass. *Id.* ¶ 70. He noted that Mr. Lillis had a temperature of 103.1 degrees but did not record any other vital signs. *Id.* ¶¶ 70-72. Defendant Frank "did not call the doctor or obtain any treatment for" Mr. Lillis and "simply continued to give Mr. Lillis ibuprofen and cold medicine, things that were clearly not working to resolve this growing infection." *Id.* ¶¶ 73-74.

The next day, December 13, 2014, Mr. Lillis was first seen by Defendant Robly Evans, RN ("Evans") at approximately 7:49 a.m. *Id.* ¶ 75. She found that Mr. Lillis had a temperature of 98.3 degrees but did not record his other vital signs. *Id.* Later that day, at approximately 2:33 p.m., Defendant Evans saw Mr. Lillis again, took and charted his vitals, and also "noted that he was coughing up blood." *Id.* ¶¶ 76-78. Additionally, Defendant Evans noted "a change in mental status, charting that Mr. Lillis was 'agitated at staff.'" *Id.* ¶ 81. At this point, Defendant Evans called the on-call doctor, Defendant Dennis L. Furr, D.O. ("Furr") and reported that "Mr. Lillis had 'blood-tinged sputum,'" but "didn't relay all of the critical information about Mr. Lillis' worsening condition and medical crisis," specifically that Mr. Lillis was "'producing blood.'" *Id.* ¶¶ 83-85. Defendant Furr "never came to evaluate Mr. Lillis," "did not order chest x-ray, culture of sputum, or any outside evaluation despite obvious signs of a worsening infection," and instead "ordered cough medicine that ACDF apparently does not even maintain." *Id.* ¶¶ 88, 90, 96.

Later on December 13, 2014, at approximately 4:00 p.m., Mr. Lillis was seen by Defendant Denise Elwell, RN ("Elwell") while she was conducting med pass. *Id.* ¶ 100. Defendant Elwell "observed that Mr. Lillis' coughing had slowed down but 'was still present.'" *Id.* ¶ 101. She also charted a temperature of 100.3 degrees, did not take any

additional vitals, and advised Mr. Lillis that "'no suppression medications [were] available.'" *Id.* ¶¶ 102-104. Defendant Elwell saw Mr. Lillis again at approximately 10:30 p.m. that evening and noted that "'some congestion' was heard in his 'L-Lower lung,'" but she did not take his vitals and "did not call a doctor or do anything to help Mr. Lillis obtain necessary treatment." *Id.* ¶¶ 105-107.

The next day, on December 14, 2014, at approximately 7:30 a.m., Mr. Lillis was first seen by Defendant Nancy Winegar, RN, ("Winegar"). *Id.* ¶ 109. She charted that Mr. Lillis "complained of 'weakness, sorthroat [sic], coughing, and fever x 4 days.'" *Id.* She also noted that Mr. Lillis had an elevated pulse of 121, that his throat was red, he had a temperature of 98.1 degrees, blood pressure of 104/71, respirations of 18, and a "pulse ox" of 91%. *Id.* ¶¶ 110-111.

Later that day, at approximately 4:45 p.m., Mr. Lillis told Deputy J. Crist that "he needed to speak with a nurse because he had 'liver pain.'" *Id.* ¶ 116. Subsequently, Deputy J. Crist reported this symptom to Defendant Ruth Kyambadde, RN ("Kyambadde") who "chose not to see Mr. Lillis at that time." *Id.* ¶¶ 117-118. That same evening, Mr. Lillis "called the medical control tower and 'again stated that he needed to speak with a nurse and that he wasn't feeling well'" reporting that "he was in a lot of pain and needed medication." *Id.* ¶ 119. After this call, Defendant Kyambadde saw Mr. Lillis for the first time, and he "asked to be put on a withdrawal protocol" although he was not withdrawing from any drugs at the time. *Id.* ¶¶ 120-121. Plaintiffs assert that Defendant Kyambadde "recklessly chose to ignore his confused mental state." *Id.* ¶ 124. Sometime later that night, it was reported to Defendant Kyambadde that Mr. Lillis "looked sick," and approximately forty minutes later she went to his cell, where she found him "'lying in bed

on his left side,' 'moving vigorously,' holding his breath, and asking for anxiety medications." *Id.* ¶¶ 125-128. While Defendant Kyambadde "reported that she was unable to take his vitals" because he was moving, a "video shows that Mr. Lillis was lying still the whole time for a matter of minutes while [Defendant] Kyambadde took blood pressure readings, temperature, and 'pulse ox,' but none of these readings were written down." *Id.* ¶¶ 129-131. Mr. Lillis informed Defendant Kyambadde that he had coughed up blood and was having diarrhea. *Id.* ¶¶ 135, 141. At approximately 7:13 p.m., Defendant Kyambadde returned and gave him a basin, asking him to cough up into it so she could evaluate his condition better while offering him Gatorade. *Id.* ¶¶ 136, 145.

At approximately 7:28 p.m., fifteen minutes after Defendant Kyambadde had seen Mr. Lillis, Deputy Dube watched on video as Mr. Lillis collapsed off of the toilet onto the floor. *Id.* ¶ 149. At approximately 7:30 p.m., Deputy Dube reported the fall to Defendant Kyambadde, but she "wanted to see how he had fallen so the video was played backwards." *Id.* ¶¶ 150-151. Defendant Kyambadde and Deputy Crist entered Mr. Lillis' cell at approximately 7:41 p.m., eleven minutes after she had been informed of his fall. *Id.* ¶¶ 159-160. They found him "unresponsive," with "blood coming out of his mouth," "surrounded by his own blood and vomit," and with only a "faint pulse." *Id.* ¶¶ 160-164. A medical emergency was called at 7:43 p.m., but "the emergency equipment, including the Automatic External Defibrillator was not readily available" and "by the time an AED could be brought to Mr. Lillis his heart no longer showed electrical activity." *Id.* ¶¶ 165, 167, 170. Mr. Lillis was pronounced dead at 8:09 p.m. *Id.* ¶ 177. The autopsy performed found that his death was "caused by 'sepsis due to severe lobar pneumonia.'" *Id.* ¶ 181.

Defendant Arapahoe County is "ultimately responsible for the operation of the

Arapahoe County Detention Facility" and employed Defendants Brown, Winegar, Frank, and Kyambadde. *Id.* ¶¶ 29, 33, 36, 37, 38. Defendant Maxim Healthcare Services, Inc. ("Maxim") contracted with Defendant Arapahoe County to provide nursing services to inmates at ACDF. *Id.* ¶ 25. Defendant Maxim employed Defendants Evans and Elwell. *Id.* ¶¶ 34-35. Defendants Correctional Healthcare Companies, LLC ("CHC") and Correct Care Solutions ("CCS") (collectively "CHC/CCS") contracted with Arapahoe County to provide physician and other medical services at ACDF.[4] *Id.* ¶¶ 17-18. Defendant Correctional Healthcare Physicians, P.C. ("CHP") and its successor entity Defendant Great Peak Healthcare Services, P.C. ("Great Peak") are believed to have contracted with Defendant Furr. *Id.* ¶¶ 19-20. Defendants CCS, CHC, CHP, and Great Peak are collectively referred to by Plaintiffs as the "CHC/CCS Defendants." *Id.* ¶ 21.

Plaintiffs assert three claims for relief: (1) a Fourteenth Amendment Claim for deliberately indifferent medical care against all of the individual Defendants; (2) a Fourteenth Amendment claim for deliberately indifferent policies against Defendants Arapahoe County, Maxim, and the CHC/CCS Defendants; and (3) a wrongful death claim against Defendants Maxim, Furr, Evans, Elwell, and the CHC/CCS Defendants. *Id.* at 38, 42, 46.

All of the individual Defendants move to dismiss Plaintiffs' first claim. *See Furr's*

---

[4] CHC operated in Colorado as a provider of medical services to jails through 2014, when it was merged with or was acquired by CCS. *Compl.* [#1] ¶¶ 18-19. For the sake of brevity, the Court refers to CHC and CCS collectively as "CHC/CCS." The CHC/CCS Defendants note that they object to Plaintiffs' collective designation of them because "[t]hese are separate entities, and, by referring to them collectively, Plaintiffs do not adequately provide notice to each individual entity which specific allegations are being made by Plaintiffs against it." *CHC/CCS Defendants' Motion* [#16] at 3 n.1. However, these Defendants proceed to refer to themselves as "the CHC/CCS Defendants" and therefore the Court will as well. *See id.* at 5.

*Motion* [#21]*; ACSO Motion* [#23]; *Evans' Motion* [#36]; *Elwell's Motion* [#37]. Defendant Arapahoe County moves to dismiss the only claim asserted against it, Plaintiffs' second claim. *See Arapahoe County's Motion* [#26]. Defendant Maxim moves to dismiss Plaintiffs' second claim with respect to itself only. *See Maxim's Motion* [#35]. Finally, the CHC/CCS Defendants move to dismiss Plaintiffs' second and third claims with respect to themselves only. *See CHC/CCS Motion* [#16].

## II. Standards

### A. Federal Rule fo Civil Procedure 12(b)(1)

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to test whether the Court has jurisdiction to properly hear the case before it. Because "federal courts are courts of limited jurisdiction," the Court must have a statutory basis to exercise its jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); Fed. R. Civ. P. 12(b)(1). Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed. *F & S Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms: facial attack or factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). When reviewing a facial attack on a complaint, the Court accepts the allegations of the complaint as true. *Id.* By contrast, when reviewing a factual attack on a complaint, the Court "may not presume the truthfulness of the complaint's factual allegations." *Id.* at 1003. With a factual attack, the moving party challenges the facts upon which subject-matter jurisdiction depends. *Id.* The Court therefore must make its own findings of fact. *Id.* In order to make

its findings regarding disputed jurisdictional facts, the Court "has wide ranging discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).   The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule 12(b)(1) into a motion for summary judgment pursuant to Rule 56. *Id.*

## B.     Federal Rule of Civil Procedure 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").   "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).   To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations."  (quoting *Twombly*, 550 U.S. at 570)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n] [ ] that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 556 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III. Analysis

### A. Claim One: Fourteenth Amendment Deliberate Indifference Claim

In Claim One, Plaintiffs allege that Defendants Evans, Ellwell, Brown, Winegar, Frank, Kyambadde, and Furr, in their individual capacities, violated Mr. Lillis' Fourteenth Amendment rights through their deliberate indifference to his medical needs.[5] *See Compl.* [#1] at 38. Plaintiffs assert that each of the individual nurse Defendants "knew of and

---

[5] Pretrial detainees are protected by the Fourteenth Amendment rather than the Eighth Amendment, but the degree of protection and the analysis is the same under both Amendments. *Shue v. Laramie Cty. Det. Ctr.*, 594 F. App'x 941, 945 (10th Cir. 2014); *see also Silva v. Bd. of Cty. Cmm'rs for the Cty. of Roosevelt*, No. 2:15-cv-1046-MCA-SMV, 2017 WL 4325769, at *4 (D.N.M. Sept. 26, 2017).

disregarded the excessive risks associated with Mr. Lillis' serious and life-threatening medical condition and nonetheless, with deliberate indifference, decided not to report the severity of the symptoms or their ongoing nature, or obtain a medical evaluation or necessary urgent medical care." *Id.* ¶ 271.  Plaintiffs similarly assert that Defendant Furr, the one doctor who had been contacted by phone regarding Mr. Lillis, acted with deliberate indifference when he "decided not to evaluate Mr. Lillis, obtain for him obviously needed higher level medical evaluation, including but not limited to a chest x-ray, or otherwise provide him with obviously needed orders and tests." *Id.* ¶ 272.

The Tenth Circuit has stated that a pretrial detainee's Fourteenth Amendment deliberate indifference claim of inadequate medical care should be evaluated pursuant to the standards set by the United States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), which concerned a convicted prisoner's Eighth Amendment deliberate indifference claim.  *See Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013) (stating that pretrial detainees are owed "at least the same standard of care prison officials owe convicted inmates").  Because detainees "must rely on prison authorities to treat [their] medical needs," the Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 103-04 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  The test for deliberate indifference is both objective and subjective, in that a detainee must establish that: (1) he was deprived of a medical need that is, objectively, "sufficiently serious," and (2) that the defendant subjectively knew of and disregarded "an excessive risk to [the detainee's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

With respect to the objective component, "the test is met if the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Further, "it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee had contact with the prisoner.'" *Id.* (quoting *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005)).

Here, the ultimate harm to Mr. Lillis was death. *See Compl.* [#1] ¶ 40. Death is sufficiently serious to meet the objective component of the deliberate indifference test. *See Martinez*, 563 F.3d at 1088-89 (finding that the detainee's heart attack and death was "without a doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment") (internal quotation marks omitted); *see also Cox v. Glanz*, 800 F.3d 1231, 1240 n.3 (10th Cir. 2015) (noting that death satisfied the objective component of a deliberate indifference claim); *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) ("Obviously death constitutes a serious harm."). Thus, with respect to each of the Motions and individual Defendants below, the Court finds that the objective component is satisfied. The Court next addresses the specific facts and circumstances surrounding Plaintiffs' claim against each individual Defendant and whether Plaintiffs have sufficiently alleged the subjective component of the deliberate indifference test in order to state a plausible deliberate indifference claim.

### 1. Defendant Evans' Motion

Plaintiffs assert that Defendant Evans first saw Mr. Lillis at approximately 7:49 a.m. on December 13, 2014, and then again "sometime in the mid afternoon." *Compl.* [#1] ¶ 75.

Plaintiffs allege that, when Defendant Evans saw Mr. Lillis in the morning, his temperature was 98.3 degrees but that Defendant Evans did not take blood pressure, pulse, respiration, or oxygenation readings. *Id.* ¶ 75. When Defendant Evans saw Mr. Lillis later that afternoon, Mr. Lillis had a temperature of 98.8, blood pressure of 99/76, respiration of 26, and pulse oxygenation of 98%. *Id.* ¶ 77. Plaintiffs assert that Defendant Evans also charted that Mr. Lillis was coughing up blood and "noted a change in mental status, charting that Mr. Lillis was 'agitated at staff.'" *Id.* ¶¶ 78, 81. Additionally, Plaintiffs allege that Defendant Evans contacted the on-call doctor, Defendant Furr, and reported to him that Mr. Lillis had "blood-tinged sputum," but that Defendant Evans "didn't relay all of the critical information about Mr. Lillis' worsening condition and medical crisis to [Defendant] Furr, including that he was 'producing blood' as [he] charted." *Id.* ¶¶ 83-85. Lastly, Plaintiffs assert that Defendant Evans "abdicated his gatekeeper role" by failing to provide accurate information to a higher-level provider and not making the appropriate orders. *Response* [#56] at 6 n.2.

Defendant Evans argues that Plaintiffs' first claim against him should be dismissed because: (1) the Complaint "is devoid of any specific factual allegation that would permit any inference–let alone a reasonable one–that [Defendant] Evans acted with deliberate indifference to Lillis's medical needs"; (2) "he provided medical care to Lillis and, accordingly, no claim for deliberate indifference lies"; and (3) the Complaint "alleges nothing more than the individual nurse [D]efendants committed medical malpractice." *Evans' Motion* [#36] at 6-7, 10.

The subjective component of the deliberate indifference test "requires a plaintiff to demonstrate that officials acted with a 'sufficiently culpable state of mind.'" *Vega v. Davis*,

673 F. App'x 885, 890 (10th Cir. 2016) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Further, "a prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted). Additionally, a medical professional can be liable under the deliberate indifference standard if he "knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he may also be liable for deliberate indifference from denying access to medical care." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). In order to "establish gatekeeper liability, a plaintiff must still allege that the need for medical care was obvious to the prison official." *Estate of Martinez*, 176 F. Supp. 3d at 1227 (internal quotation marks and citations omitted).

Defendant Evans argues that Plaintiffs provide "nothing more than uninformed speculation" by asserting "what they think should be medically obvious or medically necessary . . . [and] purport[ing] to know what are the signs and symptoms of sepsis and pneumonia." *Evans' Motion* [#36] at 8. Defendant Evans goes on, however, to contest Plaintiffs "medical opinion allegations" with his own medical conclusions. *See Evans' Motion* [#36] at 8 n.6. At this stage of the litigation the Court is tasked with assessing the sufficiency of the Complaint, not the parties' medical opinions. *See Mobley*, 40 F.3d at 340. Thus, regardless of the parties' conclusions about the potential interpretations of Mr. Lillis' symptoms, Plaintiffs' assertions (i.e., that coughing up blood is a serious medical condition

that required immediate medical evaluation and that Defendant Evans noticed a change in Mr. Lillis' mental state) sufficiently allege that Defendant Evans knew that Mr. Lillis had concerning, more than typical flu-like symptoms, and that there was a "serious medical need." *See Allen v. Ferrel*, No. 11-cv-01424-CMA-MJW, 2013 WL 1222127, at *9 (D. Colo. Feb. 13, 2013) (describing that the plaintiff "ha[d] merely alleged that he had flu-like symptoms, namely vomiting, stomach cramping, and some diarrhea" which were insufficient to allege a serious medical need).

Plaintiffs assert that Defendant Evans, being aware that Mr. Lillis' condition constituted a "serious medical need," contacted the on-call doctor, but allegedly did not communicate all of Mr. Lillis' symptoms or his "worsening condition." *See Compl.* [#1] ¶ 83. Plaintiffs appear to aver that there is a distinction between "blood-tinged sputum" and coughing up blood. *See id.* ¶¶ 83-84. They allege that Defendant Evans reported to the on-call doctor only that Mr. Lillis had blood-tinged sputum, but not that he was allegedly coughing up blood. *Id.* Plaintiffs allege that this omission was material and that Defendant Evans' failure to accurately communicate all of Mr. Lillis' symptoms was a constitutionally inadequate response that prevented Mr. Lillis from receiving further evaluations and care. *See Self*, 439 F.3d at 1231. Further, Plaintiffs allege that when the on-call doctor allegedly prescribed cough and cold medicines that Defendant Evans allegedly knew to be unavailable, he took no steps to inform the on-call doctor of this information. *See Compl.* [#1] ¶¶ 91-92, 98. While Defendant Evans argues that this allegation is in "direct conflict with their opposition to [Defendant] Furr's motion to dismiss," at this stage of the litigation the Court's task is assessing the sufficiency of the allegations contained in the Complaint. *See Reply* [#67] at 9 n.4.

Plaintiffs have plausibly alleged that Defendant Evans' actions were constitutionally inadequate and that he failed to fulfill his "gatekeeper" role with respect to Mr. Lillis. Accepting as true all well-pled facts from the Complaint [#1] and viewing them in the light most favorable to Plaintiffs, the Complaint [#1] plausibly alleges that Defendant Evans' conduct violated Mr. Lillis' constitutional rights. Accordingly, Defendant Evans' Motion [#36] is **denied**.

### 2.    Defendant Elwell's Motion

Plaintiffs assert that Defendant Elwell saw Mr. Lillis at about 4:00 p.m. on December 13, 2014, while "'conducting 1600 med pass.'" *Compl.* [#1] ¶ 100. Plaintiffs allege that Defendant Elwell "observed that Mr. Lillis' coughing had slowed down but 'was still present.'" *Id.* ¶ 101. Mr. Lillis had a temperature of 100.3, but Defendant Elwell did not take readings of his blood pressure, pulse, respiration, or oxygenation. *Id.* ¶¶ 102-103. Plaintiffs assert that Defendant Elwell "next charted at 10:30 p.m. on December 13, 2014, that 'some congestion' was heard in his 'L-Lower lung,'" but he did not take readings of Mr. Lillis' blood pressure, pulse, respiration, or oxygenation and did not "call a doctor or do anything to help Mr. Lillis obtain necessary treatment." *Id.* ¶¶ 105-107.

Defendant Elwell argues that Plaintiffs' first claim should be dismissed with respect to her because the Complaint: (1) fails to state a cognizable claim; (2) "is devoid of any specific factual allegation that would permit any inference . . . that [Defendant] Elwell appreciated the decedent's serious medical needs"; (3) does not provide a basis "to infer that [Defendant] Elwell consciously disregarded Lillis's medical needs"; and (4) "alleges nothing more than the individual nurse [D]efendants committed medical malpractice." *Elwell's Motion* [#37] at 6-8, 12.

With respect to the subjective component of the deliberate indifference test, the allegations concerning Defendant Elwell do not suggest that she was aware that Mr. Lillis was exhibiting anything more than flu-like symptoms, i.e., a high temperature, "'some congestion' . . . in his 'L-Lower lung,'" and slowed but still present coughing. *See Compl.* [#1] ¶¶ 100-105; *see also Self*, 439 F.3d at 1232 ("So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met."). "Flu-like symptoms" alone generally do not constitute a "serious medical need." *Allen*, 2013 WL 1222127, at *9.

The allegations contained in the Complaint, namely that Defendant Elwell noted that Mr. Lillis' "coughing had slowed," indicate that subjectively, Defendant Elwell believed that Mr. Lillis' condition was improving rather than deteriorating. *See Compl.* [#1] ¶ 101; *see also Elwell Motion* [#37] at 7. Accepting as true all well-pled facts from the Complaint [#1] and viewing them in the light most favorable to Plaintiffs, while Plaintiffs do allege that Defendant Elwell knew that Mr. Lillis had Hepatitis C, which they aver put him at a heightened risk for infection, there is no indication that Defendant Elwell knew "that a substantial risk of serious harm exist[ed]" based on the symptoms she was aware of at the time.[6] *See Self*, 439 F.3d at 1231. Therefore, the Court finds that Plaintiffs have failed to

---

[6] Plaintiffs argue in their Response to Maxim's Motion [#58] that "a reasonable inference can be drawn that Nurse Elwell also knew that Mr. Lillis had been coughing up blood and had other concerning symptoms (because they were recorded in Mr. Lillis' chart)." *Response* [#58] at 3. However, the Complaint [#1] does not allege that Defendant Elwell actually made this inference and knew that Mr. Lillis had been coughing up blood. *See Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Further, in addition to charting at approximately 2:33 p.m. that Mr. Lillis was coughing up blood, it is likely that Defendant Evans also charted that a doctor had been contacted. *See Compl.* [#1] at 11-12. When Defendant Elwell saw

-17-

sufficiently allege that Defendant Elwell acted with deliberate indifference towards Mr. Lillis' medical needs.

Accordingly, Defendant Elwell's Motion [#37] is **granted** and Plaintiffs' First Claim is **dismissed with prejudice** with respect to Defendant Elwell.  *See Brereton*, 434 F.3d at 1219.

### 3.    Defendant Furr's Motion

Plaintiffs assert that Defendant Furr was the on-call doctor whom Defendant Evans called on December 13, 2014.  *Compl.* [#1] ¶ 83.  Plaintiffs allege that Defendant Evans told Defendant Furr that Mr. Lillis had "blood-tinged sputum."  *Id.* ¶¶ 83-84.  Plaintiffs allege that Defendant Furr "never came to evaluate Mr. Lillis."  *Id.* ¶ 96.  Additionally, Plaintiffs allege that Defendant Furr "did not order a chest x-ray, culture of the sputum, or any outside evaluation despite obvious signs of a worsening serious infection."  *Id.* ¶ 88. Further, Plaintiffs allege that Defendant Furr "merely ordered cough medicine that ACDF apparently does not even maintain," and regardless, that these medications were "completely ineffective to Mr. Lillis' bacterial infection."  *Id.* ¶¶ 90, 93.  However, Plaintiffs do not allege that, at the point in time when Defendant Furr was contacted, he knew that Mr. Lillis was suffering from a bacterial infection.

Defendant Furr argues that Plaintiffs' first claim should be dismissed with respect to him because: (1) "the Complaint fails to show that [Defendant] Furr plausibly believed that Mr. Lillis had a serious medical condition based on [Defendant] Evans's report"; and

---

Mr. Lillis at approximately 4:00 p.m. on that same day, the information that a doctor had recently been contacted coupled with the appearance that some of Mr. Lillis' symptoms were improving, i.e., that his cough had slowed, do not permit the inference that Defendant Elwell knew that Mr. Lillis faced a significant risk of harm.

(2) "[Defendant] Furr's alleged treatment of Mr. Lillis does not plausibly amount to reckless disregard of his condition." *Furr's Motion* [#21] at 4-5.

With respect to the subjective component of the deliberate indifference test, Plaintiffs' allegations indicate that Defendant Furr knew that "Mr. Lillis had 'blood-tinged sputum,'" but that he was unaware of Mr. Lillis' ongoing and worsening symptoms including that he was coughing up and "producing" blood. *See Compl.* [#1] ¶ 85. Defendant Furr responded to this reported symptom by ordering that Mr. Lillis receive cough medicine. *Id.* ¶ 90. "If a prison doctor . . . responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard. . . . But where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law." *Self*, 439 F.3d at 1232. While Plaintiffs allege that "ACDF apparently does not even maintain" the cough medicine ordered by Defendant Furr because it is "the policy of Arapahoe County and CHC/CCS Defendants not to have cough medication like that," the Complaint [#1] does not allege that Defendant Furr knew that it was unavailable or was informed by the nurses that Mr. Lillis would not receive it despite his orders. Plaintiffs have not sufficiently alleged that Defendant Furr's response to Mr. Lillis' condition was constitutionally inadequate in light of the information he had received from Defendant Evans. Based on Plaintiffs' allegations, construing them in the light most favorable to them, there is no indication that Defendant Furr knew that Mr. Lillis was at "a substantial risk of serious harm" at the time he was called by Defendant Evans. *See Farmer*, 511 U.S. at 842; *see also Estelle*, 429 U.S. at 107 (finding that the plaintiff's deliberate indifference

claim failed because "the question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment").

Additionally, while Plaintiffs allege that Defendant Furr "never came to evaluate Mr. Lillis" and did not check in with nursing staff regarding his condition after prescribing the cough medicine, they also allege that "[n]ursing staff did not call Dr. Furr or any other doctor ever again." *See Compl.* [#1] ¶¶ 96-97. Based on the few symptoms that Defendant Furr knew Mr. Lillis to be exhibiting and the prescribed medicine to treat the suspected cause of those symptoms, Plaintiffs have not alleged that Defendant Furr would or should have known that Mr. Lillis was severely ill and required additional medical attention. Thus, the allegations do not indicate that Defendant Furr inferred that Mr. Lillis' condition put him at a risk of serious harm that would have necessitated a follow-up.

Accordingly, Defendant Furr's Motion [#21] is **granted** and Plaintiffs' first claim is **dismissed with prejudice** with respect to Defendant Furr. *See Brereton*, 434 F.3d at 1219.

### 4. The ACSO Defendants' Motion

The ACSO Defendants, consisting of Defendants Brown, Winegar, Frank, and Kyambadde, argue that: (1) pursuant to Fed. R. Civ. P. 12(f), Plaintiffs' Complaint does not comply with the pleading standards; (2) Plaintiffs fail to state a plausible claim for relief; and (3) they are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment deliberate indifference claim. *ACSO's Motion* [#23] at 10, 16.

The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court's analysis of qualified immunity in the context of a 12(b)(6) motion involves two inquiries. The Court must determine whether the alleged facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court must also consider whether the plaintiff has shown that "the constitutional right was clearly established at the time of the alleged unlawful activity." *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court may assess these inquiries in either order. *Pearson*, 555 U.S. at 236.

As discussed above, in order to establish a constitutional violation for deliberate indifference, the test is both objective and subjective: a prisoner must establish that he was deprived of a medical need that is, objectively, "sufficiently serious" and that the defendant knew of and disregarded "an excessive risk to [the prisoner's] health or safety." *Farmer*, 511 U.S. at 834, 837. The ACSO Defendants do not contest that the objective component is satisfied with respect to Mr. Lillis. *See ACSO's Motion* [#23] at 12.

### a. Pleading Standards

As an initial matter, the ACSO Defendants argue that pursuant to Fed. R. Civ. P. 12(f), large portions of Plaintiffs' Complaint should be stricken. *ACSO's Motion* [#23] at 7. They argue that the Complaint [#1] contains "immaterial, impertinent, and or scandalous allegations and statements, improper legal argument and case citations, inappropriate commentary apparently designed to inflame public opinion or appeal to persons not party [sic] to this case, and other material more appropriate to a legal brief or closing argument."

*Id.* at 8. Additionally, the ACSO Defendants argue that Plaintiffs' Complaint [#1] "contains improper evidentiary allegations and detail, and allegations concerning inadmissible subsequent remedial measures that are inappropriate for inclusion in a pleading . . . and/or barred under the Federal Rules [sic] of Evidence 407." *Id.* at 9. Finally, the ACSO Defendants argue that the photograph included in the Complaint is improper and should be stricken. *Id.* at 9.

Plaintiffs argue "[t]his is a complex multi-party multi-claim case, and Plaintiffs are entitled to fully plead their claims." *Response to ACSO* [#43] at 8. Further, Plaintiffs argue that, while a heightened pleading standard does not apply, the "demanding proof requirements inherent in § 1983 claims," and particularly deliberate indifference claims, "necessitates [sic] a more detailed complaint." *Id.*

Fed. R. Civ. P. 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The rule's purpose is to conserve time and resources by avoiding litigation of issues which will not affect the outcome of the case." *Sierra Club v. Tri-State Generation & Transmission Ass'n*, 173 F.R.D. 275, 285 (D. Colo. 1997) (internal citation omitted). However, motions to strike are disfavored and will only be granted under the rarest of circumstances. *Sierra Club*, 173 F.R.D. at 285. As such, the moving party's "burden of proof is a heavy one." *Holzberlein v. OM Fin. Life Ins. Co.*, No. 08-cv-02053-LTB, 2008 WL 5381503, at *1 (D. Colo. Dec. 22, 2008). Further, "[e]ven where the challenged allegations fall within the categories set forth in the rule, a party must usually make a showing of prejudice before the court will grant a motion to strike." *Sierra Club*, 173 F.R.D. at 285. Moreover, regardless of whether the moving party has met its burden to prove that allegations contained in a

pleading violate Rule 12(f), discretion remains with the Court to grant or deny the motion. *See* Fed. R. Civ. P. 12(f) (denoting only that allegations which are subject to Rule 12(f) "may" be stricken).

Here, the ACSO Defendants have not met this heavy burden. The Court has reviewed the portions of the Complaint to which they refer. *See ACSO's Motion* [#23] at 8 (citing *Compl.* [#1] ¶¶ 156, 161, 166, 178-79, 182-94, 197-99, 201-11, 213, 215-16, 219-20, 231-61, 263, 266-68, 284, 287-89). While the allegations may not be flattering to the ACSO Defendants, such is the nature of many lawsuits, and absent abuse, Plaintiffs are permitted to make factual *allegations* in support of their claims. Regardless of the ACSO Defendants' argument that they need not show prejudice, they have not demonstrated that the inclusion of factual allegations in the Complaint, which discovery will ultimately prove or disprove, is prejudicial or necessary to strike for any other reason. *See Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-KMT, 2015 WL 7253286, at *2 (D. Colo. Nov. 16, 2015) ("[S]triking factual allegations in a charging document is not the preferred remedy.").

Accordingly, the ACSO Defendants' Motion [#23] is **denied** with respect to their request to strike portions of Plaintiffs' Complaint.

### b. Defendant Brown

Plaintiffs assert that Defendant Brown saw Mr. Lillis at approximately 4:51 p.m. on December 12, 2014. *Compl.* [#1] ¶ 60. Plaintiffs allege that Defendant Brown charted that Mr. Lillis had "chills and fever, congestion and cough that is non-productive." *Id.* ¶ 61 (internal quotation marks omitted). Plaintiffs further allege that Defendant Brown charted that Mr. Lillis had a fever of 102.5, blood pressure of 115/80, pulse of 100, respirations of

20, a pulse oxygenation of 91%, and was complaining of nausea and diarrhea, which "are signs that an illness has a systemic component likely caused by bacteria." *Id.* ¶¶ 62-64. Additionally, Plaintiffs assert that Defendant Brown knew that Mr. Lillis had Hepatitis C, "which put him at an increased risk from infections." *Id.* ¶ 67. Lastly, Plaintiffs allege that Defendant Brown did not "even call a doctor or obtain any treatment for this obviously sick man" and "instead started a "Headache Protocol," giving Mr. Lillis ibuprofen and Gatorade. *Id.* ¶¶ 68-69.

With respect to the subjective component of the deliberate indifference test, Plaintiffs assert that it is met with respect to Defendant Brown because "knowing that Mr. Lillis had been persistently and increasingly sick for days, had a dangerously high fever, a worsening cough, diarrhea, and nausea and an elevated pulse, she did not even call a doctor or obtain any evaluation for this obviously sick man." *Response to ACSO* [#43] at 15. Based on Plaintiffs' allegations, the symptoms that Defendant Brown allegedly knew Mr. Lillis had were chills, fever, sinus congestion, a non-productive cough, nausea, and diarrhea. *See Compl.* [#1] ¶¶ 61-64. Plaintiffs do not allege that Defendant Brown knew that Mr. Lillis was coughing up blood or otherwise in serious distress. *Cf. Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. 2016) (finding that the plaintiff had plausibly alleged that the nurse defendant had acted with deliberate indifference because the plaintiff exhibited worsening symptoms including shortness of breath, chest pains, fever, poor skin color, low blood pressure, and that the nurse had remarked that the plaintiff "was 'one sick cookie'" without obtaining emergency medical treatment for her). As stated above, "flu-like symptoms" do not generally rise to the level of severity necessary to constitute a "serious medical need." *See Allen*, 2013 WL 1222127, at *9. Defendant Brown "started a Headache Protocol and gave

-24-

Mr. Lillis ibuprofen and Gatorade," which were responsive to the symptoms of which she allegedly took note. *See Self*, 439 F.3d at 1233 ("So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate . . . the requisite state of mind cannot be met."). Because Plaintiffs' allegations do not show that Defendant Brown made the inference that Mr. Lillis faced a "substantial risk of serious harm," there is no showing that she exhibited deliberate indifference towards a serious medical need. Thus, the Court finds that Defendant Brown's actions do not rise to the level of a constitutional violation.

Finding that Plaintiffs' claim does not rise to the level of a constitutional violation with respect to Defendant Brown, the Court need not determine whether the "clearly established right" prong of the qualified immunity test is met. *See Saucier*, 533 U.S. at 201. Therefore, Defendant Brown is entitled to qualified immunity. Accordingly, the ACSO Defendants' Motion [#23] is **granted in part** with respect to Defendant Brown and Plaintiffs' first claim is **dismissed with prejudice** with respect to her. *See Brereton*, 434 F.3d at 1219.

### c. Defendant Frank

Plaintiffs assert that Defendant Frank saw Mr. Lillis at approximately 10:19 p.m. on December 12, 2014, during a med pass. *Compl.* [#1] ¶ 70. Plaintiffs allege that at that time Mr. Lillis' temperature was 103.1, that Defendant Frank did not take Mr. Lillis' blood pressure, pulse, respiration, or pulse oxygenation readings, that he "did not call the doctor or obtain any treatment for this obviously sick man," and that he "continued to give Mr. Lillis ibuprofen and cold medicine, things that were clearly not working to resolve this growing

infection." *Id.* ¶¶ 72-74. There is no allegation that Defendant Frank knew that Mr. Lillis had a bacterial infection.

With respect to the subjective component of the deliberate indifference test, Plaintiffs assert that it is met with respect to Defendant Frank because in addition to charting an "extremely high temperature of 103.1," he knew that Mr. Lilllis "had been persistently sick for days with a high fever, cough, nausea, and diarrhea, as well as having consistently concerning vital sign readings." *Response* [#43] at 15. As discussed above, these symptoms, absent any knowledge that Mr. Lillis was also coughing up blood, are "flu-like" and not generally sufficient to show a "substantial risk of serious harm." *See Allen*, 2013 WL 1222127, at *9. Based on Plaintiffs' allegations, Defendant Frank was aware that Mr. Lillis was receiving treatment under flu and headache protocols and that he continued to exhibit "flu-like symptoms." Defendant Frank continued these protocols and despite the fact that the prescribed courses of treatment were tragically ineffective, there is no indication that Defendant Frank had inferred the serious risk posed to Mr. Lillis. Thus, the Court finds that Defendant Frank's actions do not rise to the level of a constitutional violation.

Finding that Plaintiffs' claim does not rise to the level of a constitutional violation, the Court need not determine whether the "clearly established right" prong of the qualified immunity test is met. *See Saucier*, 533 U.S. at 201. Accordingly, the ACSO Defendants' Motion [#23] is **granted in part** with respect to Defendant Frank and Plaintiffs' first claim is **dismissed with prejudice** with respect to him. *See Brereton*, 434 F.3d at 1219.

####    d.    Defendant Winegar

Plaintiffs assert that Defendant Winegar saw Mr. Lillis at approximately 7:30 a.m. on December 14, 2014, during "AM med pass." *Compl.* [#1] ¶ 109. Plaintiffs allege that Defendant Winegar "charted that Mr. Lillis complained of 'weakness, sorthroat [sic], coughing, and fever x 4 days," that "he had an elevated pulse of 121 and that his throat was red." *Id.* ¶¶ 109-110. Further, Plaintiffs assert that Defendant Winegar noted that Mr. Lillis "had a temperature of 98.1, blood pressure of 104/71, respirations of 18, and a pulse ox of 91%." *Id.* ¶ 111. Plaintiffs assert that Mr. Lillis' pulse and blood pressure readings were signs of sepsis and pneumonia and indicated that he "was probably going into sepsis and becoming hypovolemic." *Id.* ¶¶ 112-114. Finally, Plaintiffs assert that Defendant Winegar "provided no meaningful medical attention and instead just told Mr. Lillis to rest and drink fluids." *Id.* ¶ 115.

Plaintiffs assert that the subjective component of the deliberate indifference test is met with respect to Defendant Winegar because, on the morning of the day Mr. Lillis died, "[s]he charted that Mr. Lillis complained of 'weakness, sore-throat, coughing, and fever' for four days." *Response to ACSO* [#43] at 16. As discussed above, fever, nausea, coughing, etc. are classified as "flu-like symptoms" and are not generally sufficient to constitute a "serious medical need." *See Allen*, 2013 WL 1222127, at *9. Based on Plaintiffs' allegations, Defendant Winegar knew that Mr. Lillis' temperature had been high for four days, but noted that it had come down to 98.1, indicating that at least one of Mr. Lillis' symptoms had improved. There is no indication that Defendant Winegar knew that Mr. Lillis was coughing up blood or that his other vital sign readings indicated the severity of what was actually occurring. Defendant Winegar's alleged advice to Mr. Lillis to "rest and drink fluids" was responsive to the symptoms of which she allegedly took note. *See Self*,

439 F.3d at 1233. Therefore, the Court finds that Defendant Winegar's actions do not rise to the level of a constitutional violation. Finding that Plaintiffs' claim does not rise to the level of a constitutional violation, the Court need not determine whether the "clearly established right" prong of the qualified immunity test is met. *See Saucier*, 533 U.S. at 201.

Accordingly, the ACSO Defendants' Motion [#23] is **granted in part** with respect to Defendant Winegar and Plaintiffs' first claim is **dismissed with prejudice** with respect to him. *See Brereton*, 434 F.3d at 1219.

### e. Defendant Kyambadde

Plaintiffs assert that Defendant Kyambadde was informed by a Deputy in the early evening on December 14, 2014, that Mr. Lillis "'had liver pain'" and that Defendant Kyambadde "chose not to see Mr. Lillis at that time." *Compl.* [#1] ¶¶ 116-118. Plaintiffs next allege that Defendant Kyambadde responded to Mr. Lillis' cell that evening after "Mr. Lillis called the medical control tower and 'again stated that he needed to speak with a nurse and that he wasn't feeling well.' He reported that he was in a lot of pain and needed medication." *Id.* ¶¶ 119-120. Subsequently, Plaintiffs allege that Mr. Lillis asked Defendant Kyambadde "to be put on a withdrawal protocol despite having been incarcerated for months and thus not withdrawing from any drugs at that time, to all the involved medical workers' knowledge," and that when Defendant Kyambadde asked from what drugs he was withdrawing, he said, "'None.'" *Id.* ¶ 121. Plaintiffs allege that Mr. Lillis' mental state of confusion and disorientation is "a common symptom of both sepsis and pneumonia" and that Defendant Kyambadde "recklessly chose to ignore [Mr. Lillis'] confused mental state." *Id.* ¶¶ 123-124.

Plaintiffs next allege that later that evening, at approximately 6:15 p.m., a deputy reported to Defendant Kyambadde that Mr. Lillis "looked sick" and that he was "seen on video extremely restless, getting up and down, holding his head in his hands, and unable to stay in one position for too long." *Id.* ¶¶ 125-126. Plaintiffs allege that Defendant Kyambadde checked on Mr. Lillis approximately forty minutes later and stated that he was "'moving vigorously,' holding his breath, and asking for anxiety medications" and that she "was unable to take his vital signs" because of his continued movement. *Id.* ¶¶ 128-129. Plaintiffs assert, however, that this is "outrageously false" and that a "video shows that Mr. Lillis was lying still the whole time . . . while [Defendant] Kyambadde took blood pressure readings, temperature, and pulse ox." *Id.* ¶¶ 129-130. Plaintiffs allege that Defendant Kyambadde attributed Mr. Lillis' condition to "faking and 'holding his breath'" and that when Mr. Lillis told her he had been coughing up blood, she retrieved a basin and "'asked him to cough up into that basin, so she could evaluate him better.'" *Id.* ¶¶ 134-136. She then "offered Mr. Lillis some Gatorade." *Id.* ¶ 145. Shortly thereafter, Plaintiffs assert that a deputy watching the cameras in the medical unit reported to Defendant Kyambadde that at 7:28 p.m. Mr. Lillis had "fallen from the toilet." *Id.* ¶ 149-151. Plaintiffs further assert that Defendant Kyambadde "inexplicably had the deputy rewind the video to watch him falling off the toilet and laying [sic] on the floor in agonizing pain" and that it "took over ten minutes before [Defendant] Kyambadde went to his cell." *Id.* ¶¶ 155-158. Plaintiffs assert that when Defendant Kyambadde entered Mr. Lillis' cell, he was unresponsive, had a "'faint pulse,'" "had blood coming out of his mouth," and "was surrounded by his own blood and vomit on the floor." *Id.* ¶¶ 160-164. Lastly, Plaintiffs assert that at 7:43 p.m., approximately two minutes after Defendant Kyambadde entered Mr. Lillis' cell, "a medical emergency was

called" and Defendant Kyambadde "asked for 'an AED from booking and emergency air.'" *Id.* ¶¶ 165-168.  Mr. Lillis was pronounced dead at 8:09 p.m.  *Id.* ¶ 177.

With respect to the subjective component of the deliberate indifference test, "'[a] claim is . . . actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious.'"  *Estate of Martinez*, 176 F. Supp. 3d at 1227 (quoting *Self*, 439 F.3d at 1232).  Here, based on the allegations contained in the Complaint [#1], Mr. Lillis' need for additional medical treatment was glaringly obvious at the time that Defendant Kyambadde saw him.  While Defendant Kyambadde eventually called a medical emergency, she did so only after multiple interactions with Mr. Lillis, reports from others that he "looked sick" and his condition was worsening, knowledge that he had developed "liver pain," was coughing up blood, was having diarrhea, was possibly disoriented, and had fallen to the floor of his cell and not been able to get back up.  *See Compl.* [#1] ¶¶ 116-117, 121-123, 125, 135-141, 150-165.  Based on the allegations that Mr. Lillis had asked for medical attention multiple times that evening, had new "liver pain," and had been given a Gatorade and a basin in response to informing Defendant Kyambadde that he was coughing up blood, Plaintiffs have plausibly alleged that Defendant Kyambadde was aware that Mr. Lillis had a serious medical need.  *See Kellum*, 657 F. App'x at 770 (explaining that the factual allegations in the complaint sufficiently stated a plausible deliberate indifference claim because of the "specific medical symptoms and vital signs presented to [the defendant] that indicated a need for further assessment, testing, diagnosis, and emergency medical treatment").

Additionally, after Defendant Kyambadde received the information regarding Mr. Lillis' symptoms and requests for medical attention, she received the information that Mr.

Lillis had fallen and remained on the floor of his cell. Coupled with the knowledge of his current medical state, the fall indicated a serious risk to Mr. Lillis' health. Defendant Kyambadde delayed going to Mr. Lillis' aid, instead watching the tape of him falling from the toilet and arriving at his cell approximately ten minutes after his fall. *See Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) ("[A] delay in medical care 'only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.'") (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *see also Mata*, 427 F.3d at 751 ("A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition.); *Kellum*, 657 F. App'x at 770 ("Even a brief delay may be unconstitutional."). Thus, Plaintiffs' allegations plausibly state that Defendant Kyambadde acted with deliberate indifference and "knew of and disregarded the excessive risk to [Mr. Lillis'] health that could result from the delay." *See Sealock*, 218 F.3d at 1210 (finding that the nurse defendant was deliberately indifferent because he was "present when appellant displayed symptoms consistent with a heart attack" and did not take action).

Accordingly, Plaintiffs have plausibly alleged that Defendant Kyambadde violated a constitutional right of Mr. Lillis. *See Kellum*, 657 F. App'x at 770 (affirming the district court's finding that the plaintiff's complaint plausibly showed that the nurse defendant was deliberately indifferent when the plaintiff was "exhibiting severe, obvious, recognizable symptoms—prolonged high fever and chills, demonstrable breathing problems, nausea, low blood pressure, poor skin color, and inability to stand or walk" and the defendant did not refer her to a hospital, order additional medical testing or treatment, or perform additional medical testing or treatment).

The Court next looks to whether this right was clearly established at the time the conduct occurred. Courts must determine whether the allegedly violated constitutional right was clearly established in "the context of the particular case before the court, not as a general abstract matter." *Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005). In order for a constitutional right to be clearly established, "'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (citing *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012)). In other words, there must be case law in which a constitutional violation was found based on similar conduct. *See Callahan v. Millard Cty.*, 494 F.3d 891, 903 (10th Cir. 2007). The Supreme Court clarified that its "case law 'do[es] not require a case directly on point' for a right to be clearly established," but precedent must have placed the issue "beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

At the time of Mr. Lillis' deteriorating condition and subsequent death, the law was clear that deliberate indifference in response to a serious medical need is a violation of a clearly established constitutional right under the Fourteenth Amendment. *See, e.g.*, *Estelle*, 429 U.S. at 104 ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."). In *Mata*, 427 F.3d at 755, the Tenth Circuit stated that deliberate indifference to a prisoner's medical needs can be shown if the "defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of h[is] condition. Even a brief delay may be unconstitutional." There, the plaintiff sought medical attention from the correctional facility staff because she was suffering from severe chest pain. *Id.* The plaintiff first sought medical attention on the

evening of October 29, 2000, and was told to return in the morning when the infirmary was open. *Id.* at 750. The plaintiff returned to the infirmary the next morning, October 30, 2000, an electrocardiogram was performed, and the plaintiff was provided with a permission slip to miss various prison-related assignments. *Id.* The plaintiff's chest pain did not improve and she reported this to "several guards" before returning to the infirmary on the morning of October 31, 2000. *Id.* Another electrocardiogram was performed, it was forwarded to a doctor for review, and the doctor ordered the nurse to send the plaintiff "immediately to the hospital." *Id.* Once at the hospital, it was discovered that the plaintiff had suffered a heart attack and required surgery. *Id.* The surgery was unsuccessful and the plaintiff "suffered permanent and irreversible damage to her heart and sustained a permanent disability." *Id.* The Tenth Circuit found that one of the nurse defendants' actions could be reasonably found by a jury to be deliberately indifferent because "if [the defendant] knew that appellant had unexplained chest pain, it would have been more than mere malpractice or negligence to fail to call an ambulance or contact qualified medical personnel that could properly assess and assist [the plaintiff]." *Id.* at 758; *see also Sealock*, 218 F.3d at 1210 (holding that a delay of "several" hours in taking an inmate with chest pains to a hospital violated the Eighth Amendment).

Here, Plaintiffs have plausibly alleged that Defendant Kyambadde's conduct violated Mr. Lillis' right to receive adequate attention for a serious medical need preceding and following his fall. Therefore, Defendant Kyambadde is not entitled to qualified immunity on Plaintiffs' first claim and the ACSO Defendants' Motion [#23] is **denied in part** with respect to Defendant Kyambadde.

**B.     Claim Two: Fourteenth Amendment Deliberately Indifferent Policies Claim**

In Claim Two, Plaintiffs allege that Defendants Arapahoe County, Maxim, and the CHC/CCS Defendants maintained deliberately indifferent policies in violation of the Fourteenth Amendment. *See Compl.* [#1] at 42. Plaintiffs allege that these Defendants' deliberately indifferent policies, failures to train, and/or supervise were the "moving forces in the violation of Mr. Lillis' constitutional rights." *Id.* ¶ 297.

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) (footnote omitted). While *Monell* explicitly applies to municipal governments, the Tenth Circuit has extended the *Monell* doctrine to private entities acting under color of state law. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted). A private entity however, "cannot be held liable *solely* because it employs a tortfeasor–or, in other words . . . cannot be held liable under § 1983 on a respondeat superior theory."[7] *Id.* (emphasis added) (internal quotation marks omitted). "[T]o hold the entity liable, the plaintiff must identify an official policy or a custom that is the 'direct cause' or 'moving force' behind the constitutional violations." *Aguilar v. Colo. State Penitentiary*, 656 F. App'x 400, 403 (10th Cir. 2016) (quoting *Dubbs*, 336 F.3d at 1215).

---

[7] Defendant Maxim argues that Plaintiffs' § 1983 claim should be dismissed with respect to it because "the doctrine of respondeat superior does not apply to private entities in a § 1983 claim." *See Maxim's Motion* [#35] at 5 (citing *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005)). Plaintiffs do not respond to this argument in their Response [#58], although they state in the Complaint [#1] that they "intend to argue" that *Smedley* "was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions." *Compl.* [#1] at 43 n.1. Regardless, Plaintiffs do not argue a theory of respondeat superior here and thus, the Court need not address it at this time.

To demonstrate "moving force," there must be "a 'direct causal link between the action and the deprivation of federal rights.'" *Ireland v. Jefferson Cty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1226 (D. Colo. 2002) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999)). "The causation element is applied with especial rigor when the municipal policy or practices is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). The plaintiff must show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* at 769. "The deliberate indifference standard may be satisfied when the [entity] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

A municipal policy or custom can be in the form of: "(1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A policy or custom can take the form of "the failure to adequately train . . . so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson*, 627 F.3d at 788 (internal quotation marks omitted). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Harris*, 489 U.S. at 390). Only where the failure to train amounts to "deliberate indifference" can an inadequacy in training "be properly thought of as a city 'policy or custom.'" *Connick*, 563 U.S. at 61. Notice to the entity is vital when a plaintiff is proceeding on a failure to train theory because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 61.

### 1.  Defendant Arapahoe County's Motion

Defendant Arapahoe County moves to dismiss Plaintiffs' Second Claim, arguing that: (1) the Court lacks jurisdiction over it; (2) Plaintiffs' Complaint does not comply with the pleading standards; (3) and Plaintiffs do not state a plausible claim of a widespread pattern and practice of constitutional violations or deliberately indifferent care that would have alerted Defendant Arapahoe County to deficiencies in the training or supervision of nurses. *Arapahoe's Motion* [#26] at 3-4, 7.

Defendant Arapahoe County argues that "Plaintiffs have elected to disregard both the jurisdictional requirement set forth in [COLO. REV. STAT.] § 30-11-105 and clear Tenth

Circuit precedent" and that "[a]s a result, their complaint fails to vest this Court with jurisdiction over Arapahoe County and their claims against it must be dismissed." *Arapahoe's Motion* [#26] at 3.

Plaintiffs argue that Defendant Arapahoe County is "seeking to impose a state jurisdictional statute in this federal civil rights action" and that "the county that employs the individual government employees is the proper defendant, because counties are 'persons' under § 1983." *Response* [#44] at 16. Further, Plaintiffs argue that "assuming, *arguendo*, that reference to state law should guide this Court's determination of the appropriate designation of the municipal defendant, the Board of County Commissioners does not have any role in the policymaking of medical care [sic] at the detention center." *Id.* at 17. Plaintiffs note, however, that they "would be amenable to amending their claims to satisfy the concerns of the County if they were given assurances that the County was assuming liability for the acts complained of in the Complaint, if such claims are proven." *Id.* at 18.

Pursuant to COLO. REV. STAT. § 30-11-105, "[i]n all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be "The board of county commissioners of the county of . . . ." "This statutory provision provides the exclusive method by which jurisdiction over a county can be obtained. An action attempted to be brought under any other designation is a nullity, and no valid judgment can enter in such a case." *Gonzalez v. Martinez*, 403 F.3d 1179, 1187 n.7 (10th Cir. 2005) (internal quotation marks and citation omitted); *see also McCoy v. Deutsche Bank Nat'l Tr. Co.*, No. 15-cv-00613-RBJ-KLM, 2016 WL 1047822, at *4 (D. Colo. Feb. 23, 2016) (finding that the Court lacked personal jurisdiction over Arapahoe County because the plaintiffs had not complied with the statutory requirement in bringing their constitutional claims, including a § 1983

claim); *see also Handy v. Cummings*, No. 11-cv-00581-WYD-KMT, 2012 WL 4442751, at *1 (D. Colo. Sept. 26, 2012) (dismissing Arapahoe County as a defendant because the plaintiff did not name the Board of County Commissioners of Arapahoe County); *Wilkenson v. Colorado*, No. 13-cv-01469-CMA-KLM, 2013 WL 6978510, at *5 (D. Colo. Dec. 17, 2013) (explaining that the Court did not have jurisdiction over the county because the plaintiff did not properly name the Board and County Commissioners of the County of Mesa, but explaining that "a simple amendment" to the complaint "would easily cure this technical defect"). Because Plaintiffs improperly brought their second claim against "Arapahoe County" and not the board of county commissioners, the Court lacks jurisdiction to make any determination of the merits of the claim with respect to Defendant Arapahoe County.

Accordingly, Defendant Arapahoe County's Motion [#26] is **granted** and Plaintiffs' second claim is **dismissed without prejudice** with respect to Defendant Arapahoe County. *See Brereton*, 434 F.3d at 1216-17 (explaining that a dismissal on jurisdictional grounds should be without prejudice).

### 2. Defendant Maxim's Motion

Defendant Maxim moves to dismiss Plaintiffs' second claim for deliberately indifferent policies with respect to it arguing that: (1) it is not liable for the conduct of Defendants Evans and Elwell because "the doctrine of *respondeat superior* does not apply to private entities in a § 1983 action"; (2) "the Complaint is devoid of **any** allegation that identifies a specific Maxim policy, much less that any such policy was followed by the Maxim nurses in this case and that allegedly played a causal role in Lillis' death"; (3) the nurse Defendants were following protocols provided by the CHC/CCS Defendants; (4)

"Plaintiffs' reference to other unrelated lawsuits against Maxim does not save their legally deficient allegations" because "[t]he absence of any findings or admissions of guilt renders these suits irrelevant"; and (5) "four lawsuits in four separate states over an eight (8) year period hardly constitutes a widespread pattern or practice." *Maxim's Motion* [#35] at 2, 5-6, 10-12 (emphasis in original).

Plaintiffs allege that Defendant Maxim was "acting under the color of state law, as the functional equivalent of a municipality providing medical care to inmates." *Compl.* [#1] ¶ 292. Plaintiffs do not point to a written policy of Defendant Maxim's but allege that Defendant Maxim "maintain[s] unconstitutional policies and customs regarding providing emergency and/or higher level care in a timely manner." *Compl.* [#1] ¶ 218. Specifically, Plaintiffs allege that:

> there was a widespread pattern and practice of deliberately indifferent medical care in ACDF . . . which included: not having inmates seen or evaluated by higher level medical providers, even when necessary to prevent serious injury or death; allowing and training nurses to practice outside their nursing scope; refusing to transfer inmates to a higher level of acuity even where necessary to prevent serious injury or death; and, a widespread custom and tolerated practice and habit of treating all inmate or detainee illnesses as faked or not serious until an inmate/detainee can prove otherwise . . . often to save money on providers and testing.

*Id.* ¶ 219. Additionally, Plaintiffs allege that Defendant Maxim "failed to adequately train and supervise their nursing staff, amounting to deliberate indifference to the serious medical needs of inmates presenting with serious conditions requiring medical evaluation and treatment." *Compl.* [#1] ¶ 222. Further, Plaintiffs allege that Defendant Maxim "train[s] and supervise[s] ACDF nurses to adopt a reckless wait and see approach to serious medical conditions, and not to immediately have inmates with symptoms indicating serious conditions timely evaluated by higher-level professionals." *Id.* ¶ 227. As discussed above,

Plaintiffs have adequately alleged that one of Maxim's employees, Defendant Evans, acted with deliberate indifference, sufficient to meet the requirement here of an underlying constitutional violation.  *See Schneider*, 717 F.3d at 769.

Defendant Maxim argues that Plaintiffs "have not identified a single Maxim policy or custom and practice" and instead that Plaintiffs improperly "make numerous conclusory allegations against the County, Maxim, and the CHC/CCS Defendants collectively."[1]  *Id.* at 7-8.  Plaintiffs argue that each entity "is alleged to have unconstitutionally maintained a 'wait and see' approach" and that their allegations are meant to indicate that each entity Defendant engaged in the alleged activities.  *See Response* [#58] at 13.  Despite Defendant Maxim's argument to the contrary that it "is left only to guess as to the nature of the Maxim policy to which Plaintiffs purport to refer," the Complaint [#1] makes it clear which alleged policies or customs Plaintiffs are referring to: those enumerated above.  *See Compl.* [#1] ¶¶ 218-19.  While Plaintiffs allege that similar policies were maintained by several of the entity Defendants, with respect to Defendant Maxim, it is clear which allegations pertain to it.  *See Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) ("[I]t

---

[1]  Defendants additionally argue that Plaintiffs allege that the CHC/CCS Defendants "'provide the protocols and training related to such protocols to nurses.' . . . [and] [i]t is those protocols that the relevant nurses were following, or attempting to follow, in their treatment of the decedent."  *Maxim's Motion* [#35] at 6.  In support of this argument, Defendant Maxim cites to paragraphs of Plaintiffs' Complaint regarding a non-party nurse initiating "an 'Influenza-Like-Illness' and Respiratory Infection protocols" and Defendant Brown initiating a "Headache Protocol."  *See id.*; *see also Compl.* [#1] ¶¶ 51, 69.  Neither of these nurses were the two that were employed by Defendant Maxim.  Additionally, the portion of the Complaint [#1] that Defendant Maxim cites to for this proposition, appears to relate to the CHC/CCS Defendants' training of its nurse employees and does not mention Defendant Maxim, Defendant Maxim's employees, or Defendant Maxim's training protocols.  *See Compl.* [#1].  Regardless, this factual issue is inappropriate for resolution on a Motion to Dismiss.

is incumbent upon a plaintiff to identify *specific* actions taken by *particular* defendants in order to make out a viable § 1983 . . . claim.").

With regard to whether Defendant Maxim was on notice that its training and/or policies were inadequate, Plaintiffs allege that "[t]he need for such training and the probability that the failure to provide such training would cause an inmate like Mr. Lillis to die of a treatable illness like pneumonia was so obvious that . . . Maxim's failure to do so constituted deliberate indifference." *Compl.* [#1] ¶ 224. Plaintiffs argue that "both Nurse Evans and Nurse Elwell provided inadequate care to Mr. Lillis in similar ways," which demonstrates either deficiencies in Defendant Maxim's training program or inadequate training of its employees. *See Response* [#58] at 8. However, as discussed above, Plaintiffs have sufficiently alleged only that Defendant Evans allegedly acted with deliberate indifference towards Mr. Lillis, not Defendant Elwell. Thus, Plaintiffs' argument that Defendant Maxim's employees provided care in similar ways and that this supports a finding of inadequate training, fails.

Plaintiffs also argue that Defendant Maxim was on notice of deficiencies in the nurses' training because "Maxim has a pattern of similar misconduct at other facilities where it provided nursing services to inmates" such as: (1) a 2009 lawsuit regarding the death of a detainee due to untreated pneumonia in a detention facility in Oregon; (2) a 2015 lawsuit regarding an inmate's death due to gastrointestinal bleeding and alcohol withdrawal in Ohio; (3) a 2016 lawsuit regarding a delay in treatment for an inmate's cancer resulting in the removal of his anus, appendix, and ten feet of his colon, in Arizona; and (4) a 2016 lawsuit regarding the amputation of an inmate's left leg and subsequent death in Colorado. *See Compl.* ¶¶ 258-261 (citing *Wheeler v. Multnomah Cty. et al.*, No. 3:09-cv-1518-AC (D.

Or.); *Pullins v. Franklin Cty., Ohio, et al.*, No. 2:15-cv-2919 (S.D. Ohio); *Garrison v. Ariz., et al.*, No. 4:16-cv-00074 (D. Ariz.); *Choquette v. CCA et al.*, No. 16-cv-1845 (D. Colo.)). Plaintiffs do not allege the outcomes of these lawsuits.[2] *See id.* Based on the allegations in the Complaint, the allegations regarding delaying or denying medical care and facts involved in these other four lawsuits appear similar to those involved in Mr. Lillis' case. However, "[u]nsubstantiated allegations from complaints filed against the [ ] defendants, without more, do not put the [ ] defendants on notice that the training of their nursing staff is deficient." *Lobato*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017); *see also Rowley v. Morant*, No. 10-cv-1182-WJ-GBW, 2014 WL 11430980, at *2 (D.N.M. July 14, 2014) ("[T]he mere fact that a lawsuit was filed without any mention of the disposition of the lawsuit or whether the City was found to have violated any rights does not establish a pattern and practice."); *see also Morris v. City of N.Y.*, No. 12-cv-3959, 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013) ("The fact that two of the defendants as well as a non-defendant supervising officer have had civil suits brought against them in the past that resulted in settlements is not even evidence of wrongdoing, let alone that the City has a custom or policy that fosters or results in wrongdoing."). "Notice of particular deficiencies in a training program is the crux of a failure-to-train theory because '[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.'" *Lobato*, 2017 WL 1197295, at *7 (quoting *Connick*, 563 U.S. at 61).

---

[2] Defendants provide various court filings from each of the lawsuits cited by Plaintiffs. However, the details provided in these documents are not material at this time.

Plaintiffs' allegation that Defendant Maxim "train[s] and supervise[s] ACDF nurses to adopt a reckless wait and see approach" is also not supported by a showing that Defendant Maxim was on notice that its training inadequacies were "so obvious, and the [inadequacies] so likely to result in the violation of constitutional rights" that their conduct amounts to deliberate indifference. Plaintiffs' allegation focuses on nurses not contacting higher-level medical providers in order for inmates with serious health concerns to be seen in a timely manner. While Plaintiffs allege that Mr. Lillis was never *seen* by a higher level medical professional, Defendant Maxim's employee, Defendant Evans, did contact the on-call doctor. *See Compl.* [#1] ¶ 96. Defendant Evans' conduct in contacting the on-call doctor would not put Defendant Maxim on notice that its employees were failing to contact higher-level medical professionals.

Therefore, the Court finds that Plaintiffs fail to sufficiently allege that Defendant Maxim was on notice that its training, policies, or customs were inadequate. *See Connick*, 563 U.S. at 61; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 399-400 (1989) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell.*") (internal quotation marks omitted).

Accordingly, Defendant Maxim's Motion [#35] is **granted** and Plaintiffs' second claim is **dismissed with prejudice** with respect to it. *See Brereton*, 434 F.3d at 1219 ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

### 3.    Defendants CHC, CCS, CHP, and Great Peak's Motion

Defendants CHC, CCS, CHP, and Great Peaks (collectively the "CHC/CCS Defendants") move to dismiss Plaintiffs' second claim against them because "neither (A) the six nurses; nor (B) Dr. Furr can bind the CHC/CCS Defendants through their conduct." *CHC/CCS Defendants' Motion* [#16] at 5.

Plaintiffs' Complaint [#1] makes clear that Defendant Furr was the only individual defendant employed by the CHC/CCS Defendants and, as discussed above, Plaintiffs have not set forth sufficient allegations demonstrating that his actions violated a constitutional right of Mr. Lillis.  *See Compl.* [#1] ¶ 32.  Thus, Plaintiffs have not shown that the CHC/CCS Defendants are liable for any unconstitutional acts of their employees.  *See Ireland*, 193 F. Supp. 2d at 1225 (explaining that a plaintiff must make a requisite showing of an underlying constitutional violation in order to impose municipal liability).  Nevertheless, the inquiry does not end there, because Plaintiffs allege that despite the fact that the CHC/CCS Defendants did not employ Defendants Evans and Elwell, these entities were responsible for the ongoing training of all of the nurses at ACDF.  *See Compl.* [#1] ¶ 212.

Regardless of the parties' arguments concerning the individual Defendants' employers, the specific policies and customs at issue, or whether the CHC/CCS Defendants had notice that these policies and customs were allegedly deficient, in order to be liable, the CHC/CCS Defendants must also be the "moving force" behind the constitutional violation.  *See Ireland*, 193 F. Supp. 2d at 1226.  To demonstrate "moving force," there must be "a direct causal link between the action and the deprivation of federal rights."  *Ireland*,193 F. Supp. 2d at 1226 (internal quotation marks omitted); *see also Aguilar*, 656 F. App'x at 403.  An entity "'is only liable when it can be fairly said that the

[entity] itself is the wrongdoer.'" *Rohrbough v. Stone*, 189 F. Supp. 2d 1088, 1103 (D. Colo. 2001) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992)). Here, Plaintiffs' own allegations provide that Defendants Evans and Kyambadde, the only nurse Defendants whom they have sufficiently asserted acted with deliberate indifference towards Mr. Lillis' health needs, were the "moving force" behind the harms suffered by Mr. Lillis. *See Reohrbough*, 189 F. Supp. 2d at 1103 (finding that the individual gunmen were the moving force behind the victim's injuries, rather than the County or the Sheriff's Department); *see also Ireland*, 193 F. Supp. 2d at 1227 (finding that the individual gunmen were the moving force behind the plaintiff's injuries and that the "[p]laintiff's allegations that his injuries could have been avoided if there were different policies in place or adequate training do not state a viable claim"). While Plaintiffs allege that the CHC/CCS Defendants provided policies and training to nurses employed by other entities, they do not plausibly allege that Defendants Evans and Kyambadde were compelled to their actions/inactions by the policies, customs, training, etc. of the CHC/CCS Defendants. Rather, the allegations suggest that the actions taken by Defendants Evans, who was employed by Defendant Maxim, and Defendant Kyambadde, who was employed by Defendant Arapahoe County, were taken pursuant to the individuals' own choices and the allegations do not support a claim that other training or policies from the CHC/CCS Defendants would have changed those decisions.

Thus, Plaintiffs have failed to sufficiently allege municipal liability with respect to the CHC/CCS Defendants because they have not shown that there is a "direct causal link between the policy or custom and the injury alleged." *See Bryson*, 627 F.3d at 788. Accordingly, the CHC/CCS Defendants' Motion [#16] is **granted in part** with respect to

Plaintiffs' second claim and it is **dismissed with prejudice** with respect to them.  *See*

*Brereton*, 434 F.3d at 1219.

**C.     Claim Three: Wrongful Death**

Plaintiffs' third claim for wrongful death alleges that the CHC/CCS Defendants[3] (1)

"are vicariously liable for the negligent acts and omissions by their agents and/or

employees"; (2) "are directly liable as they breached their duty to exercise reasonable care

in the training and supervision of their employees and agents in a manner that provided the

detainees under their care with reasonable medical care and treatment"; and (3) that in

"failing to exercise reasonable care in the training and supervision of their employees and

agents . . . CHC/CCS Defendants were negligent and proximately caused Mr. Lillis[']

death."  *Compl.* [#1] ¶¶ 317-319.

The CHC/CCS Defendants argue that because the individual nurse Defendants were

employed by other entity Defendants, "Plaintiffs' claim based on a theory of vicarious

liability . . . cannot be established through the alleged negligence of the Defendant Nurses"

and that allowing Plaintiffs to proceed on such a theory "would be patently unfair."

*CHC/CCS's Motion* [#16] at 8-9.   Additionally, the CHC/CCS Defendants argue that

Plaintiffs' third claim is "statutorily prohibited under Colo. Rev. Stat. § 12-36-134," the

corporate practice of medicine doctrine.  *CHC/CCS's Motion* [#16] at 9.  Further, the

CHC/CCS Defendants argue that Plaintiffs have failed to show that they owed Mr. Lillis a

duty to supervise or train the nurses at ACDF and thus, without owing a duty, the CHC/CCS

Defendants cannot be found negligent.  *See Reply* [#63] at 6.  Lastly, the CHC/CCS

---

[3] Plaintiffs third claim for wrongful death is also brought against Defendants Maxim, Evans, Furr, and Elwell.  These Defendants have not moved to dismiss this claim against them.

Defendants argue that there are no allegations that Defendant CHP, which Plaintiffs allege contracted with Defendant Furr, "was involved in the supervision or training of the Defendant Nurses" and even "assuming *arguendo* that CHC or CCS owed a duty to Mr. Lillis to supervise and train employees of Arapahoe County," Plaintiffs' third claim should be dismissed with respect to CHP. *See id.* At 7. However, Plaintiffs' allegations in Claim Three are asserted against all of the CHC/CCS Defendants, including Defendant CHP. *See Compl.* [#1] at 46-49. Therefore, because Plaintiffs allege that *all* of the CHC/CCS Defendants "knew or should have known that the lack of supervision, experience, and training among their employees and agents was likely to harm ACDF detainees," the CHC/CCS Defendants' argument that there are no allegations pertaining to CHP lacks merit. *See id.* ¶¶ 317-320.

As an initial matter, COLO. REV. STAT. § 12-36-134 applies only to any physician employees of a professional corporation. *See Kellner v. Schultz*, 937 F. Supp. 2d 1319, 1326 (D. Colo. 2013) ("[T]he corporate practice of medicine doctrine does not extend to non-physician hospital employees, such as nurses."). As discussed above, the only employee of the CHC/CCS Defendants is Defendant Furr, whose actions, as alleged by Plaintiffs, did not deprive Mr. Lillis of any constitutional rights. *See* § III.A.3. Plaintiffs appear to concede that vicarious liability is inapplicable to the CHC/CCS Defendants with respect to Defendant Furr and focus on their allegation that these entities are directly liable for breaching a duty of care, by stating that "while professional corporations that employ or contract with physicians may not be held vicariously liable for the negligent acts of those physicians . . . Colorado law explicitly provides that the corporate practice of medicine doctrine does not abrogate a cause of action against a professional corporation for its

independent acts of negligence." *See Response* [#45] at 18-19 (internal quotation marks and citations omitted). Here, Plaintiffs are alleging that the CHC/CCS Defendants were independently negligent in training and supervising the nursing staff at ACDF, "despite having a duty, imposed by contract and law, to do so with reasonable care." *Id.* at 19. Plaintiffs allege that these duties of care in supervising and training the nursing staff arise under contract and COLO. REV. STAT. § 16-3-401(2), which states that "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."

"Whether a particular defendant owes a legal duty to a particular plaintiff, as well as the scope of the duty owed, are questions of law for a court to resolve." *Mbaku v. Bank of Am., Nat'l Ass'n*, No. 12-cv-00190-PAB-KLM, 2013 WL 6978531, at *5 (D. Colo. Aug. 24, 2013) (quoting *Settle v. Basinger*, 411 P.3d 717, 723 (Colo. App. 2013)). To determine the existence of this duty, the Court considers "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden guarding against injury or harm, and the consequences of placing the burden upon the actor." *Mbaku*, 2013 WL 6978531, at *5 (quoting *Settle*, 411 P.3d at 723).

With respect to Plaintiffs' argument that the CHC/CCS Defendants owed Mr. Lillis a duty to supervise the individual nurse Defendants, "[a] defendant's duty to supervise arises only when it has reason to know that its agent or employee is likely to harm others because of [their] qualities and the work or instrumentalities entrusted to her." *Id.* (internal quotation marks omitted). "Therefore, there is only a breach of the duty to supervise if the principal/employer knows that the agent/employee is incompetent, vicious, or careless and fails to take the care which a prudent person would take in selecting the person for the

business at hand." *Id.* (internal quotation marks omitted); *see also Keller v. Koca*, 111 P.3d 445, 447 (Colo. 2005) (stating that the duty is breached when the "employer knows or should have known that the employee would cause harm"); *Moses v. Diocese of Colo.*, 863 P.2d 310, 327 (Colo. 1993) (stating that there is a breach of the duty to care when the defendant does not recognize potential employee attribute[s] of character or prior conduct which would create an undue risk of harm to those with whom the employee came in contact in executing [her] employment responsibilities") (internal quotation marks omitted).

Here, Plaintiffs do not allege that the CHC/CCS Defendants knew or should have known that the individual nurses, were "likely to harm others" or that their personal qualities posed a risk of harm to Mr. Lillis. Thus, Plaintiffs have not sufficiently alleged that the CHC/CCS Defendants owed a duty to supervise the individual nurse Defendants who cared for Mr. Lillis. *See Mbaku*, 2013 WL 6978531, at *6 (finding that the plaintiff did not sufficiently allege that the defendant owed the plaintiff a duty to supervise and thus failed to state a claim for negligent supervision); *see also Settle*, 411 P.3d at 723 ("[T]here is no liability for breach of the duty to supervise unless the principal or employer both knows the agent or employee is not incompetent, vicious, or careless, and does not take the care which a prudent person would take in selecting the person for the business in hand.") (internal brackets and quotation marks omitted).

With respect to Plaintiffs' argument that the CHC/CCS Defendants owed Mr. Lillis a duty to train the nursing staff at ACDF, the CHC/CCS Defendants cite to no law to support their argument that they did not owe Mr. Lillis this duty. *See Reply* [#63] at 6. Plaintiffs allege that as part of the contract between the CHC/CCS Defendants and Defendant Arapahoe County, the CHC/CCS Defendants were to "provide protocols and

training related to such protocols to nurses, including on when to call on-call doctors." *Compl.* [#1] ¶ 212. Plaintiffs further allege that "the CHC/CCS Defendants breached this duty by failing to exercise reasonable care in training . . . ACDF staff" and that this negligence was a proximate cause of Mr. Lillis' death. *See Response* [#45] at 18. While the CHC/CCS Defendants argue that "Plaintiffs do not explain the scope of the duty that the CHC/CCS Defendants undertook," they provide no contrary explanation regarding the scope of their contractual duties. *See Reply* [#63] at 6. At this stage of the litigation, accepting all well-pled facts from the Complaint [#1] as true and viewing them in the light most favorable to Plaintiffs, they have plausibly alleged that the CHC/CCS Defendants undertook a duty to provide training to the nurses at ACDF, specifically relating to when nurses were to contact the on-call doctor in order to seek higher-level medical care.

Accordingly, the CHC/CCS Defendants' Motion [#16] is **denied in part** with respect to Plaintiffs' third claim.

## IV. Conclusion

IT IS HEREBY **ORDERED** that Defendant Evans' Motion [#36] is **DENIED**.

IT IS FURTHER **ORDERED** that Defendant Elwell's Motion [#37] is **GRANTED** and Plaintiffs' First Claim is **DISMISSED with prejudice** with respect to Defendant Elwell.

IT IS FURTHER **ORDERED** that Defendant Furr's Motion [#21] is **GRANTED** and Plaintiffs' first claim is **DISMISSED with prejudice** with respect to Defendant Furr.

IT IS FURTHER **ORDERED** that the ACSO Defendants' Motion [#23] is **GRANTED in part** and **DENIED in part**. The ACSO Defendants' Motion is **GRANTED** with respect to Defendants Winegar, Brown, and Frank. Plaintiffs' First Claim is **DISMISSED with**

**prejudice** with respect to Defendants Winegar, Brown, and Frank. The ACSO Defendants' Motion is **DENIED** with respect to their request to strike portions of Plaintiffs' Complaint and with respect to Defendant Kyambadde.

IT IS FURTHER **ORDERED** that Defendant Arapahoe County's Motion [#26] is **GRANTED** and Plaintiffs' second claim is **DISMISSED without prejudice** with respect to it.

IT IS FURTHER **ORDERED** that Defendant Maxim's Motion [#35] is **GRANTED** and Plaintiffs' second claim is **DISMISSED with prejudice** with respect to it.

IT IS FURTHER **ORDERED** that the CHC/CCS Defendants' Motion [#16] is **GRANTED in part** and **DENIED in part**. The CHC/CCS Defendants' Motion [#16] is **GRANTED** with respect to Plaintiffs' Second Claim and it is **DISMISSED with prejudice** with respect to those Defendants. The CHC/CCS Defendants' Motion [#16] is **DENIED** with respect to Plaintiffs' Third Claim.[4]

IT IS FURTHER **ORDERED** that the stay on discovery imposed on September 8, 2017, is lifted.

Dated: March 30, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge

---

[4] Remaining in this lawsuit are Plaintiffs' First Claim against Defendants Evans and Kyambadde and Plaintiffs' Third Claim against Defendants Maxim, Furr, Evans, Elwell, and the CHC/CCS Defendants. *See Compl.* [#1] at 38, 46.